UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

JOHN DOE,
                                     **Civil Action No:**  5:18-CV-0377
                **Plaintiff,**                                (DNH/DEP)

              -against-

                                     **JURY TRIAL DEMANDED**

**SYRACUSE UNIVERSITY, SYRACUSE
UNIVERSITY BOARD OF TRUSTEES, KENT
SYVERUD,** in his individual capacity, **PAMELA
PETER,** in her individual capacity**, SHEILA
JOHNSON-WILLIS,** in her individual capacity**, and
BERNERD JACOBSON,** in his individual capacity,

                **Defendants.**
------------------------------------------------------------------------X



## COMPLAINT

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP,

as and for his Complaint against Defendants, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.     This case arises out of the damaging actions taken and inadequate procedures

employed by Defendants Syracuse, Kent Syverud, Pamela Peter, Sheila Johnson-Willis and

Bernerd Jacobson (collectively, "Defendants") in investigating and adjudicating erroneously with

a gender bias a complaint of sexual misconduct filed by Jane Roe[2] against John Doe.

2.     The Complaint alleging non-consensual sexual intercourse arose out of a fully

consensual sexual encounter between John Doe and Jane Roe that occurred in the early morning

hours of September 1, 2016.

---

[1] Plaintiff has filed herewisth a motion to proceed pseudonymously as "John Doe."

[2] Roe is referred to herein pseudonymously.

3.      Jane Roe intitially acknowledged that she consented to vaginal sexual intercourse (which she indeed had, having willingly performd oral sex on Doe in a dormitory common area and then cleared a bedroom so that she and Doe could have sexual intercourse), but that she had not consented to anal intercourse (which, in actuality, never occurred).

4.      Subsequently, during the investigation, Roe completely changed her account, saying she withdrew consent during sexual intercourse and had not consented to the oral sex she gave Doe in the common room prior to leading him into the bedroom to have intercourse with him.

5.      Jane Roe's denial that she consented to oral sex, and her fabricated story of anal sex, were both ultimately rejected by the University Conduct Board, which explicitly found that Roe's actions evidenced consent to oral sex, and that there was no evidence from which it could conclude anal sex had occurred.

6.      Nevertheless, despite having rightly rejected two-thirds of Roe's false allegations concerning her sexual encounter with Doe (and, as a corollary, having implicitly acknowledged Doe's credible denials as to two-thirds of Roe's allegations), the Board inexplicably credited Roe's belated claim that she withdrew consent to vaginal sexual intercourse during the course of engaging in that act; found Doe responsible for sexual assault; and indefinitely suspended him.

7.      Throughout the investigation and adjudication of Roe's complaint, Defendants engaged in substantial errors in violation of federal law, state law and the University's own policies. A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants relied upon a gender biased investigative report produced by an investigator who acted as a prosecutor building a case for the complainant and disregarding the changes in and inconsistencies of Jane Roe's story;  (ii) Defendants failed to provide John Doe proper and

adequate notice of the charges against him; (iii) Defendants evidenced a gender bias against John Doe as the male accused of sexual misconduct throughout the investigative process; (iv) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (v) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; (vi) Defendants deprived John Doe of the opportunity to confront and question his accuser, and ultimately deprived him of the ability even to hear her testimony and evaluate whether the procedure was fair and complied with the University's policies.

8.     Accordingly, John Doe brings this action to obtain relief based on causes of action for violation of Title IX of the Education Amendments of 1972, violation of New York State Constitution Procedural Due Process, breach of contract, and promissory estoppel.

## THE PARTIES

9.     John Doe is a natural person and resident of the State of New York.  John Doe was a student at Defendant Syracuse and resided on Defendant Syracuse's campus.  John Doe is currently an indefinitely suspended second year student of Defendant Syracuse, having been previously enrolled in the Defendant University's College of Arts and Sciences and having matriculated with the class of 2019.

10.     Defendant Syracuse University, located in Syracuse, New York, is a private research institution.

11.     Defendant Syracuse Board of Trustees ("Defendant Syracuse Board of Trustees") currently has forty-five (45) voting members and has the responsibility for making rules and regulations to govern the University.

12.     Upon information and belief, Kent Syverud ("Defendant Syverud") is a resident of the State of New York and was the Chancellor and President of Syracuse and a voting member of the Defendant Syracuse Board of Trustees at all relevant times herein.

13.     Upon information and belief, Pamela Peter ("Defendant Peter") is a resident of the State of New York and was Assistant Dean/Director of the Office of Student Rights and Responsibilities at Syracuse at all relevant times herein

14.     Upon information and belief, Sheila Johnson-Willis ("Defendant Johnson-Willis") is a resident of the State of New York and was the Interim Chief, Equal Opportunity and Title IX Officer at Syracuse at all relevant times herein.

15.     Upon information and belief, Bernerd "Bernie" Jacobson ("Defendant Jacobson") is a resident of the State of New York and was an Equal Opportunity and Title IX Investigator at Syracuse at all relevant times herein.

## JURISDICTION AND VENUE

16.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims that form the same case or controversy under Article III of the United States Constitution.

17.     This Court has personal jurisdiction over Defendant Syracuse on the ground that it is conducting business within the State of New York and the Northern District of New York.

18.     This Court has personal jurisdiction over Defendant Syverud on the grounds that he was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

4

19.     This Court has personal jurisdiction over Defendant Peter on the grounds that she was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

20.     This Court has personal jurisdiction over Defendant Johnson-Willis on the grounds that she was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

21.     This Court has personal jurisdiction over Defendant Jacobson on the grounds that he was an employee of Defendant Syracuse at all relevant times herein and personally acted within the State of New York and the Northern District of New York.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.**     **Defendant Syracuse's Policies and Contract With John Doe.**

22.     John Doe grew up in New York City and lived there his entire life, except for two years when his family lived in New Zealand.

23.     Doe attended school in Manhattan through seventh grade and then went to boarding school in Massachusetts. Along with sports and outdoors activities, John Doe devoted time to community service. During two summers, he volunteered in Atlanta at a program for children who had suffered strokes to help them learn how to better use the parts of their bodies effected by their stroke. He participated in volunteer work with his high school and in other countries including Peru and the Dominican Republic where he built greenhouses and was an assistant teacher for disadvantaged children.

24.     Prior to the alleged incident in September 2016, John Doe never had any disciplinary problems at Defendant Syracuse.

25.     Upon his acceptance to Defendant Syracuse, John Doe was provided online access to copies of Defendant Syracuse's school policies, including the Student Conduct System Handbook ("Handbook"), the Code of Conduct (the "Code"), and the Sexual and Relationship Violence Resource Guide for Defendant Syracuse students ("SRV Resource Guide").   The Handboook, the Code and the SRV Resource Guide are collectively called the "Policies."

26.     These Policies set forth the procedures by which Syracuse students who have been accused of violating one or more of the enumerated Policies are investigated, heard, and, possibly, disciplined.

27.     Upon matriculating as a freshman at Defendant Syracuse in the fall of 2015, Doe completed a one-time online module, "Think About It," which was "an interactive, online experience designed to help students make smart decisions in college around sex, alcohol, and drugs."

28.     The Policies were revised and reissued prior to Doe's sophomore year at Syracuse.

29.     As a returning sophomore in the fall of 2016, Doe was not provided with the new sexual misconduct prevention and education online initiatives required for first year students.

30.     The relationship between John Doe and Defendant Syracuse is governed by the Student Conduct System Handbook for the 2016-2017 Academic Year.[3]

31.     The Student Conduct System Handbook constitutes a contract between students and the University and, in particular, between Doe and Defendant Syracuse.

32.     A copy of the Student Conduct System Handbook is provided to or available to each student.

---

[3] All references herein to the Handbook are to the 2016-2017 edition.

33.     The Student Conduct System Handbook includes the Code of Student Conduct and the Conduct System Procedures.

34.     The Student Conduct System Handbook also contains a section titled "Syracuse University Policy On Sexual Assault, Sexual Harassment, Stalking Or Relationship Violence (the "Sexual Misconduct Policy").

35.     The Sexual Misconduct Policy prohibits, *inter alia*, harassment, sexual assault, and relationship violence.

36.     The Sexual Misconduct Policy substantially limits an accused student's rights during the disciplinary process, notwithstanding the oftentimes more serious nature of the charges considered under this Policy -- namely, sexual misconduct, including sexual assault and rape.

37.     The University's Policies do, however, provide Syracuse students with several important rights, none of which Doe was ultimately afforded in the instant matter:

a) the right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard" (*Bill of Rights*, ¶4);

b) the right "not to be discriminated against by any agent or organization of Syracuse University" on the basis of their gender (*Student Rights and Responsibilities*, 2 ("Non-Discrimination"); and

c) "a right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct—as provided in the published procedures of the University's Student Conduct System or other official University publications" (*Student Rights and Responsibilities*, 9 ("Fundamental Fairness").

**B.**     **New York State Education Law Article 129-B and Due Process**

38.     On July 7, 2015, New York State Governor Andrew Cuomo signed into law Education Law Article 129-B ("Art. 129-B"), commonly known as "Enough is Enough," which became effective on October 5, 2015. *See* NY Educ. L. § 6438 *et seq*. (2015).

39.     Art. 129-B was passed, *inter alia*, to provide an allegedly fair and consistent administrative process to students in higher education accused of sexual assault, domestic violence, dating violence or stalking.

40.     Art. 129-B applies to all public and private institutions of higher education in the State of New York. It mandates that all such institutions adopt certain rules and procedures in connection with their sexual misconduct policies.

41.     Art. 129-B mandates that each institution file with the State a certificate of compliance with the law, and well as a copy of all written rules and policies adopted in accordance with the statute. If any institution fails to file a certificate of compliance, it will be ineligible to receive state aid or assistance until such time as it files the certificate.

42.     Art. 129-B also requires the State to conduct random audits to ensure compliance with the provisions of the statute.

43.     Art. 129-B specifies that its provisions apply regardless of whether an alleged violation occurs on campus, off campus, or abroad.

44.     Art. 129-B mandates that all New York State institutions of higher education implement, among other things:

- a specific, State-afffirmed definition of affirmative consent to sexual activity;

- a specific, State-afffirmed policy for alcohol and/or drug use amnesty;

- a specific, State-afffirmed student bill of rights; and

8

- a specific, State-afffirmed reponse to reports of alleged misconduct.

45.     Art. 129-B provides students accused of sexual assault, domestic violence, dating violence or stalking with the "right to a process in all student judicial conduct cases…that includes, *at a minimum* … an opportunity to … present evidence and testimony at a hearing, where appropriate, and have access to a full and fair record of any such hearing, which shall be preserved and maintained for at least five years from such a hearing . . . ." NY Educ. L. § 6444(5)(b).

46.     Art. 129-B also mandates that the accused has a right to "a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely and thorough manner by individuals who receive annual training in conducting investigations of sexual violence…including the right to a presumption that the respondent is 'not responsible.'" NY Educ. L. § 6444(5)(c)(ii).

47.     Art. 129-B further requires an "investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest." NY Educ. L. § 6444(5)(c)(iii).

48.     Finally, Art. 129-B gives all students the right "to review and present available evidence in the case file, or otherwise in the possession or control of the institution, and relevant to the conduct case[.]"NY Educ. L. § 6444(5)(c)(iv).

49.     Nevertheless, Art. 129-B, by its express terms, affords greater rights to reporting individuals than accused individuals.

50.     For example, the mandatory student bill of rights requires that a reporting individual "[b]e free from any suggestion that [she] is at fault when these crimes and violations

are committed, or should have acted in a different manner to avoid such crimes or violations."
NY Educ. L. § 6443.

51.     Not only does this presuppose the existence of a "crime or violation," it omits any concurrent right of the accused to be free from the suggestion that he is at fault, or should have acted in a different manner.

52.     The statute also requires institutions to provide multiple forms of assistance to reporting individuals, including assistance obtaining an order of protection against the accused (a civil proceeding which takes place in the courts of New York State).

53.     Moreover, the statute forces institutions to make a notation on the transcript of students found responsible after a conduct process, *see* NY Educ. L. § 6443(6), thus forever affecting their reputation and good name.

54.      On information and belief, SU has adopted policies and procedures as mandated by the State of New York and has, consistent with the adoption of those policies and procedures, acted under the color of state law in connection with all sexual misconduct disciplinary proceedings carried out by the University since Art. 129-B went into effect, including the disciplinary proceeding in the instant case.

**C.      The "Incident" On The Night of September 1, 2016**

55.     On September 1, 2016, starting at around 9:00 pm, John Doe and his roommate drank a few beers each in their room and then headed to Harry's Bar on Marshall Street in downtown Syracuse.

56.     Doe and his roommate, after being admitted into Harry's Bar, entered and talked with some friends, and a little while later got in line to get drinks. They each got a beer and continued to hang out in the bar.

57.     After a short while, they ran into a few people they knew, including Doe's friend ZM and another woman, CK, who lived on the same dormitory floor the prior year.  CK was with a few of her friends, including Jane Roe.

58.     Doe and his roommate conversed with the group of friends, including ZM, CK and Roe.  There was some kissing and embracing by couples within the group.

59.     The group decided to go to a nearby fraternity house. Doe and Roe continued to talk and learned more about each other in terms of heir interests and backgrounds.

60.     As the fraternity party was winding down and people started to leave, Roe invited Doe to come back to her room.

61.     John Doe left the fraternity house along with CK, some of her roommates, and Roe. This group then went to buy food. Afterwards, Doe walked to Roe's room with her and her roommates.  The group ate the food together in the common area of the suite.

62.     When they were finished eating, Roe's roommates each went to their bedrooms, leaving Doe and Roe alone in the common area.

63.     Doe and Roe began to kiss and passionately touch each other's bodies over their clothing.

64.     Roe moved her hand inside Doe's pants, touching his genitals. Doe then put his hand inside Roe's pants, doing the same.

65.     Doe asked Roe if she wanted to engage in oral sex. Roe verbally and affirmatively consented to the act.

66.     Roe then briefly performed oral sex on Doe in the common area of Roe's suite. Roe then suggested they go to her bedroom to continue their sexual encounter. Doe agreed.

67.     Roe and Doe went to Roe's bedroom, and Roe asked her roomates to leave.

68.     Said one student witness to the situation, it was "pretty clear what they were going to do and [Roe] seemed okay with it."

69.     Roe and Doe lay down on Roe's bed and removed their own clothes. They then discussed having sexual intercourse. Doe said that he did not have a condom. Roe suggested that they could have sexual intercourse if Doe withdrew his penis before ejaculation. Doe agreed and moved on top of Roe, at which point they engaged in consensual sexual intercourse for approximately ten minutes until Doe withdrew his penis so as not to ejaculate inside Roe's vagina.  At no time did Roe tell Doe to stop.

70.     During this time, at least one other student heard "like sex noises" coming from Roe's room, "but nothing unusual."

71.     Afterwards, Doe got dressed and Roe asked if they could exchange contact information so they could see each other again.

72.     Doe and Roe kissed goodbye, and then he left her room.

73.     At no point did Doe and Roe engage in anal sex.

**D.     The Period Following The Night of September 1, 2016**

74.     The following day, September 2, 2016, Roe and Doe sent texts to one another, and Roe invited Doe back to her room again. Doe had commitments that day and could not go to see her, however.

75.     After a few days, Doe became concerned that perhaps he and Roe had been too reckless by having unprotected sex and that there was a chance she could become pregnant. Doe sent Roe a text message saying he hoped that nothing had occurred that could result in a pregnancy.

76.     The next day, Doe saw Roe with friends. The group went back to the fraternity house where they met previously, had drinks, and went to Chipolte to eat together. Roe behaved normally around Doe.

77.     Approximately four days later, Doe heard that there were rumors starting to surface that he had done "unspeakable things" to Roe. Doe was shocked and confused, as the sexual intercourse he had engaged in with Roe was both consensual and perfectly ordinary.

78.     After the rumors started, Doe avoided Roe. Then, not quite two months after the September 1 incident, on or about October 27, 2016, Roe brought a formal complaint against Doe for alleged sexual misconduct.

79.     Roe's complaint, as it was finally submitted to the University Conduct Board, was that Doe made her perform oral sex on him without her consent; that she withdrew consent to vaginal intercourse; and that Doe had anal intercourse with her without her consent.

**E.      Jane Roe's University Complaint and The Investigation**

80.     Per SU's Policies, upon receipt of a formal complaint, the Title IX Coordinator designates an investigator to conduct an investigation. (*Student Conduct System Procedures*, 10.4.)

81.     Here, the Title IX Coordinator designated Defendant Bernie Jacobson as investigator.

82.     On or about November 14, 2016, Doe received an e-mail notification from Defendant Jacobson that the University had received a formal complaint against Doe for conduct that may violate the Code of Student Conduct.  The e-mail notification invited Doe to meet with persons in the Title IX office and discuss the investigation.

83.     The notification did not provide Doe with any particulars as to the alleged conduct or the potential Code of Student Conduct violations.

84.     The lack of particulars in the notice proved highly prejudicial to Doe because it permitted Roe to change her story without documentary proof that such a change had occurred.

85.     Specifically, Doe learned, in his meeting with Defendant Jacobson, that Roe had first said the vaginal intercourse with Doe was consensual, but the oral and alleged anal sex were not. Yet Roe later claimed, in a subsequent interview with Jacobson, that she had actually withdrawn consent during the vaginal intercourse.

86.     Because Roe's first set of allegations against Doe was never documented, but rather, relayed to Doe verbally, Doe had nothing concrete to which he could point when Roe changed her story.

87.     This was not the only problem with the investigation into Roe's complaint, however. The Title IX Office proceeded to conduct an investigation of Roe's complaint that was not remotely adequate, reliable, or impartial.

88.     SU's Policies provide that the investigator "will have the authority to meet with both the complainant, respondent, and witnesses to the alleged incident to gather information regarding the facts and circumstances of the incident." (*Student Conduct System Procedures*, 10.4.)

89.     Based on these interviews, the investigator compiles an investigation report. The respondent and complainant are both "given the opportunity to review the report and provide a written response within three (3) business days[.]" Any responses to the report are provided to the Office of Student Rights and Responsibilities, as well as to the other party. (*Student Conduct System Procedures*, 10.5.)

90.     "The report will describe the relevant facts and circumstances learned during the course of the investigation and will contain all of the interviews conducted by the investigator." (*Student Conduct System Procedures*, 10.7.)

91.     Here, the investigation was tainted by investigator bias from its inception. Defendant Jacobson has a background in assisting, advising, and protecting the rights of victims of sexual assault. Upon information and belief, he thus went into the investigation with biased preconceptions concerning Doe's presumed guilt (rather than his presumed innocence), and Roe's presumed reliability (despite the multiple contradictory and inconsistent statements Roe gave throughout the proceedings).

92.     In short, Defendant Jacobson acted not as a neutral investigator, but as a prosecutor and an advocate developing a case for the "victim."

93.     As set forth above, during the investigation, Roe completely revised her account of the incident. At first, Roe acknowledged that she had consented to the vaginal intercourse but said the oral sex and the (completely fabricated) anal sex were nonconsensual, and Defendant Jacobson so stated to Doe in their first interview. Then, in a subsequent interview with Jacobson, Roe claimed she had withdrawn consent during vaginal intercourse and that Doe had ignored her request to discontinue the act.

94.     Despite these glaring inconsistencies in Roe's accounts of her encounter with Doe, Defendant Jacobson inexplicably treated Roe's testimony as "consistent."

95.     Defendant Jacobson interviewed Doe only once and failed to investigate issues that Doe raised about the events in question and about Roe's credibility. For example, Doe told Jacobson that Roe had given different accounts of what happened to different people (who had

then relayed Roe's accounts to Doe). Even though this information went directly to Roe's credibility, on information and belief, Jacobson failed to investigate Roe's multiple statements.

96.     Defendant Jacobson also failed to investigate apparent contradictions concerning Roe's behavior after the alleged assault. For example, although Student 3 said Roe "didn't go out for a long time" after the alleged assault, other students mentioned Roe being at parties, sporting events, and other events around campus very shortly after the alleged assault. On information and belief, Jacobson did not investigate this issue further.

97.     Furthermore, Defendant Jacobson did not provide Doe with all of the evidence Roe submitted, nor did he give Doe an opportunity to respond to that evidence before it was submitted to the University Conduct Board.

98.     Specifically, after Jacobson issued his investigative report, Roe provided him with a letter dated January 20, 2017, written by a nurse in Roe's physician's office. In the letter the nurse recounted Roe's report of the incident with Doe and noted that Roe told the nurse she had vaginal bleeding.

99.     Notably, Roe had not alleged, during the course of the investigation, that she had vaginal bleeding, although she *had* alleged that she had anal bleeding (which was not documented in the nurse's note). Because Doe was not provided with a copy of this letter, however, Doe had no opportunity to review or challenge this evidence in any manner.

100.     Defendant Jacobson also did not inform Doe of the identities of the other witnesses he interviewed, thereby preventing Doe from being able to effectively evaluate or challenge their testimony, motives, and credibility.

101.    Doe was therefore not afforded the right "to review . . . available evidence in the case file, or otherwise in the possession or control of the institution[.]" NY Educ. L. 6444, 5(c)(v) (2015).

102.    Amazingly, Jacobson noted in his investigation report that Roe's report was "wholly plausible, no contradictions or omissions are noted," and that "significant portions" of Roe's allegations were "corroborated." These observations are at odds with the evidence, including the fact that:

- several students, including those identified by Roe, indicated that the interaction between Roe and Doe in the common room was mutual (thereby undercutting Roe's statement that she did not consent to giving Doe oral sex in the common room);

- Student 3 and Student 7 left the common room for the specific purpose of allowing Roe and Doe to hook up in privacy (thereby also undercutting Roe's claim that the oral sex that occurred in the common room was not consensual);

- When Roe and Doe did move into the bedroom (from the common room), and Roe asked her roommates to leave the room, Student 3 stated it was, "pretty clear what they were going to do and [Roe] seemed ok with it";

- Roe claimed her roommates heard her "crying" in her room, but none of the students interviewed confirmed this statement, and in fact, Student 7 said, "I feel like I did hear stuff like sex noises, but nothing unusual"; and

- Roe claimed Doe inappropriately touched her at Chipotle, and elsewhere on campus, on September 5, but none of the students who were with Roe and Doe confirmed that this alleged inappropriate touching occurred.

**F.    The Hearing and Hearing Board's Determination**

103.    Under SU's Policies, once the investigator has completed the investigation, he provides the alleged Code of Student Conduct violations, the written investigation report, and the written responses of the complainant and respondent to a three-member University Conduct Board "comprised of trained faculty and staff members[.]" (*Student Conduct System Procedures*, 10.7.)

17

104.    The Board, at its sole discretion, "may rely upon the investigator's report for its understanding of the relevant facts, or it may conduct additional witness interviews and/or gather other additional information." The Board may also interview the investigator. (*Student Conduct System Procedures*, 10.8.)

105.    "The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case." (*Student Conduct System Procedures*, 10.8.)

106.    Per the University Policies, all Board interviews are to be recorded. (*Student Conduct System Procedures*, 10.8.)

107.    On February 2, 2017, Malea Perkins of Syracuse's Office of Student Rights and Responsibilities sent by e-mail a letter to Doe advising him that the University Conduct Board would hear Roe's complaint on February 10, 2017.

108.    The February 2 letter cited three sections of the Code of Student Conduct that Doe allegedly violated on September 1, 2016.  The February 2 letter further quoted section 10.8 of the Student Conduct System Handbook:

> At its sole discretion, the University Conduct Baord may rely upon the investigator's report for its understanding of the relevant facts, or it may conduct additional witness interviews and/or agther other additional information. The University Conduct Board may also interview the investigator. **The complainant and respondent will be invited to speak to the University Conduct Board to present any additional information that they believe is relevant to the case.** Any interviews conducted by the University Conduct Board will be recorded.

(Emphasis in original.)

109.    Per the University's Policies, at the hearing, the Board must apply a "preponderance of evidence" standard  of proof, meaning it must find that it is "more likely than

not" that the respondent violated the Code of Student Conduct. (*Student Conduct System Procedures*, 5.3.)

110.    Because Doe was not given an opportunity to review the complete investigation report, including the evidence Roe submitted in letter format, or the opportunity to comment on it, Doe was hampered in his ability to adequately prepare for the hearing.

111.    On February 10, 2017, the University Conduct Board held a hearing before a three-member panel.  The hearing lasted 1 hour and 40 minutes.

112.    The University Conduct Board accepted the aforementioned nurse's note and letter from the President of Sigma Chi fraternity; neither document had been previously disclosed to Doe.

113.    Critically, the Board considered the nurse's note a "medical document that complainant submitted" which "noted vaginal bleeding." In fact, the letter was written by a nurse who simply repeated the story Roe told her – it was not a medical docuement and did not contain the results of any testing.

114.    Doe drafted questions to ask of the witnesses and Roe, but because the Board did not ask any witnesses to attend the hearing, those questions were never posed (and, for reasons set forth below, Doe was unable to ascertain whether any of the questions he submitted for Roe were in fact asked of her).

115.    Defendant Jacobson did not attend the hearing either; the Board simply accepted his investigation report as complete and accurate, when in fact, there were multiple omissions and mischaracterizations in the report.

116.     Doe was, in effect, denied a hearing before an impartial panel – he could neither confront his accuser nor question any of the witnesses, and he could not effectively present any testimony or evidence in support of his defense.

117.     On February 20, 2017, Doe received the University Conduct Board's decision in a letter of issued by Defendant Peter.  Defendant Peter's letter advised Doe he had been found "responsible" for violating the following sections of SU's Policies:

> (a) Section 1: Physical harm or threat of physical harm to any person or persons, including, but not limited to: assault, sexual abuse, or other forms of physical abuse.
> (b) Section 3: Conduct -- whether physical, verbal or electronic, oral, written or video -- which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.
>
> (c) Section 15: Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements (Syracuse University Policy on Sexual Assault, Gender Related Harassment, Stalking or Relationship Violence).

118.     According to Defendant Peter's February 20 letter, these violations were based on the Board's determination that on September 1, 2016, Doe engaged in nonconsensual vaginal sex with Roe after Roe withdrew her initial consent to the intercourse.

119.     The Board's decision was contrary to the preponderance of evidence and demonstrated a dramatic bias in favor of the female accuser, even when that accuser so clearly falsified her account of the event in question.

120.     Most notably, the Board rejected Roe's false assertion that the oral sex she performed on Doe in the common room was nonconsensual, finding, instead, that Roe in fact "demonstrated consent thorugh her actions in the common space."  In other words, the Board could not find that part of Roe's story credible.

121.    Furthermore, the Board was "unable to determine if anal sex occurred," which was yet another indication that Roe's story was a fabrication.

122.    Nothwithstanding the fact that the Board could not find Roe's account of the oral sex credible, nor could it find that the alleged anal sex had even taken place, it inexplicably concluded that one small piece of Roe's otherwise clearly fabricated narrative – that she initially consented to vaginal intercourse but withdrew her consent during the act – was somehow credible.

123.    By contrast, Doe told the Board that everything that occurred between him and Roe on the night in question was consensual (and that the anal sex never happened). Based on the Board's decision, it is clear they agreed that Doe credibly denied engaging in nonconsensual oral sex with Roe, and likewise credibly denied that anal sex took place. Yet the Board "found [Doe's] denial that Complainant revoked any consent she had given for the sexal activity not to be credible."

124.    The only explanation for such a finding is bias in favor of the female accuser.

125.    One direct example of this bias is the Board's observation that Roe's "actions throughout the process are consistent with a traumatic event such as she described in her statement."

126.    The only "traumatic event" the Board actually credited was Roe's purported withdrawal of consent to the vaginal intercourse she herself voluntarily and mutually initiated, and, as noted above, her version of what happened with regard to the vaginal intercourse changed over time.

127.    The Board's effort to salvage Roe's shifting and unbelievable narrative in order to find Doe responsible for *something*, even if not all of the things of which Roe had accused him,

was, upon information and belief, a result of the Board's training in so-called "trauma-informed investigation and adjudication processes." *See University Faculty, Staff Receive Training on Investigating Complaints of Sexual Violence*, Title IX Compliance, February 6, 2017 (available at https://news.syr.edu/2017/02/university-faculty-staff-receive-training-on-investigating-complaints-of-sexual-violence-title-ix-compliance/).

128.   This training is mandated by federal and New York State law, and the Office of Civil Rights has openly and specifically linked it to the protection of "girls and women." *See* https://www.nasmhpd.org/sites/default/files/FedPartnersOCR.pdf.

129.   The trauma-informed approach includes several components: 1) understanding the impact of trauma on a neurological, physical, and emotional level; 2) promoting safety and support; 3) knowing positive ways to respond that avoid retraumatization; and 4) providing choice with a goal of empowerment. *See, e.g.*, *The 7 Deadly Sins of Title IX Investigations*, The 2016 ATIXA Whitepaper (available at https://atixa.org/wordpress/wp-content/uploads/2012/01/7-Deadly-Sins_Short_with-Teaser_Reduced-Size.pdf).

130.   According to a website affiliated with trauma-informed "expert" Claire K. Hall, J.D., who offers just one of dozens of trauma-informed training courses across the country, "Trauma-informed investigations have been shown to significantly strengthen a victim's account of incidents, to create a more supportive environment and to result in a greater likelihood of holding responsible offenders accountable[.]" *See* https://www.paper-clip.com/Main/Product-Catalog/TraumaInformed-Sexual-Assault-Investigations-Train-2918.aspx.

131.   A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that

allegedly directly affect the individual's actions during the event as well as her memory of the event.

132.    According to proponents of the trauma-informed approach, "the stress associated with trauma makes it nearly impossible for the brain to accurately recall all the details of a sexual assault." *Trauma-Informed Sexual Assault Investigations Training Binder*, 2016 (available at https://www.trauma-informed-investigations.com/sites/trauma-informed-investigations.com/files/Trauma-Informed-Training-Samples.pdf).

133.    Thus, <u>investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma</u>. Similarly, <u>they are trained to view those inconsistencies as a natural byproduct of sexual assault as opposed to an indicator that the complainant's story may lack credibility</u>.

134.    However, one of the problems with this government-mandated and government-sanctioned approach – which is designed specifically to protect female complainants and to bolster the credibility of their allegations of sexual violence – is that it lacks any solid scientific support. *See* Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, <u>The Atlantic</u>, September 8, 2017 (available online at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/).

135.    Upon information and belief, Defendant Jacobson and the members of the Board received training consistent with the aforementioned principles, and applied these questionable principles to the investigation and adjudication of Roe's complaint against Doe in a manner that was designed to bolster Roe's credibility, even though major inconsistencies in her story pointed towards a *lack* of credibility (rather than to the occurrence of a trauma).

136.    Further, the Board noted that "the key component of the case was in the bedroom in which the Board evaluated the responses, statements, and credibility of [Doe] and [Roe] and found it more likely than not consent was withdrawn by [Roe] and that [Doe] continued sexual intercourse after consent was withdrawn."

137.    An objective, unbiased fact-finder would have found it virtually impossible to credit Roe over Doe, however. Notably:

- Roe changed her story at least once (first acknowledging that the vaginal intercourse was consensual, but later claiming she had withdrawn consent);

- Roe's claim that the oral sex she performed on Doe in the common room was nonconsensual was simply not credible, and the Board explicitly found that the act was consensual;

- Roe's roommates confirmed that she asked them to leave the room in order to continue her sexual encounter with Doe; and

- there was no evidence anal sex ever occurred between Roe and Doe, thereby further emphasizing Roe's clear lack of credibility (since she appears to have invented the allegation out of whole cloth).

138.    Given these glaring problems with Roe's credibility, the only way the Board could have possibly found any of her story "credible" was by viewing it through a grossly gender-biased lens. And this is precisely what it did.

139.    Finally, given the Board's findings that Roe consented to oral sex and that there was no evidence anal sex had occurred (and the implicit corollary finding that Roe's claims as to these to events lacked credibility), its ultimate conclusion that it was more likely than not that Roe was telling the truth as to one-third of her allegations against Doe was not, and could not be, supported by a preponderance of credible evidence.

**G.** **Doe's Sanction**

140.    As a resulf of the Board's erroneous decision, Doe was placed on an indefinite suspension for one academic year or until Roe graduates from Syracuse, whichever is longer. Doe is banned from all of SU's campuses.

141.    Doe can petition to return to Syracuse after Roe graduates if he supplies: (i) a personal statement reflecting on what he has learned from the incident that resulted in his departure from Syracuse and describing his activities since having been separated from Syracuse; (ii) evidence of academic progress and/or gainful employment during his time away from Syracuse; (iii) evidence of completion of at least 80 hours of community service; (iv) three character references; and (v) completion of an interview with the Sexual and Relationship Violence Response Team at the Syracuse Counseling Center.

142.    Per Art. 129-N, there is now a notation on Doe's transcript that reads, "suspended after a finding of responsibility for a code of conduct violation." *See* NY Educ. L. § 6443(6)

**H.** **Delayed Proceedings Caused Harm to Doe**

143.    Defendant Syracuse failed to conduct a timely investigation and adjudication, which caused Doe to incur tuition and expenses he would not have otherwise paid.

144.    Per SU's Policies, "[t]he process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances. If circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written notification of the delay and its cause."

145.    The Title IX guidance in effect at the time of the investigation also stated that a 60-day timeline should encompass the entire disciplinary process, excluding the appeal.

146.    Here, the University took 116 days from the time the complaint was made until Doe received notice of the hearing outcome, and the University never provided Doe with "written notification of the delay" or "its cause."

147.    As a result of this lengthy process, Doe enrolled at Syracuse for the Spring 2017 semester in good faith and with the approval of the University.   Consequently, he paid the required tuition and fees, room and board costs, traveled back to Syracuse from his home, and resumed a demanding curriculum.

148.    The delay in adjudication of Roe's complaint resulted in Doe losing one-third of his Spring semester tuition, , which would not have happened if the process had been completed within the 60-day timeline during the fall semester.

149.    The delay also lengthened the time that Doe's academic performance was impaired due to the drawn-out disciplinary process and the resulting anxiety Doe suffered.

**I.      The Appeal and The Failure To Provide A Complete Hearing Transcript**

150.    As Doe prepared for his appeal, some five months after Roe first initiated the complaint process, Doe requested, pursuant to SU's Policies, a transcript of the Board hearing. (*See Student Conduct System Procedures*, 10.8.) His intent in so doing was to accurately cite what had occurred, but also to examine the hearing for any procedural irregularities that may have occurred outside of his presence (and which he would otherwise not know about).

151.    The existence of a procedural irregularity is one ground of appeal under the University's Policies. (*Student Conduct System Procedures*, 12.3.)

152.    Doe requested an extension of time to submit his appeal until he had received the transcript, but that request was denied.

153.    On March 10, 2017, Doe submitted his appeal.

154.    On March 29, 2017, Doe received the transcript and discovered that it did not include any of Roe's testimony or the questions addressed to Roe by the Board.

155.    The University claimed that, "due to technical difficulties," Roe's testimony was not recorded.

156.    As a consequence, Doe was prevented from ascertaining what had occurred during Roe's testimony. He could not hear or challenge what she said; he could not determine whether inappropriate or irrelevant information was discussed or considered during her testimony; he could not know what evidence Roe presented during her testimony and whether that evidence was consistent with the evidence she presented throughout the course of the proceedings; and he could not know whether the Board, through its questioning, had demonstrated any biases or other improprieties.

157.    In short, because of the absence of a recording of Roe's testimony, Doe had absolutely no way to challenge any potential procedural irregularities that may have occurred, thereby irreparably depriving him of potential grounds for appeal. *See* Conduct System Procedure 12.3.

158.    Furthermore, because of the absence of a recording of Roe's testimony, the Appeals Board had no way of properly evaluating the findings of the Board, since it could not test those findings by referring to the original evidence presented at the hearing. (*See Student Conduct System Procedures*, 12.6 and 12.7.)

159.    A full record of the hearing in front of the Board was particularly important on appeal because the Board ultimately found Doe responsible based in part on its finding that Roe's *testimony – i.e.*, the testimony she gave in front of the Conduct Board – was more credible

27

than Doe's. Yet the Appeals Board had no way of knowing what Roe testified to, or why it was purportedly more credible, because it could not hear or read that testimony absent a recording.

160.   On April 12, 2017, Rebecca Reed Kantrowitz, Interim Senior Associate Vice President and Dean, informed Doe by letter that the University Appeals Board had, on April 5, 2017, denied his appeal and sustained the February 20, 2017 decision reached by the University Conduct Board.

161.   As noted above, SU's Policies make clear that "[s]tudents have a right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct—as provided in the published procedures of the University's Student Conduct System or other official University publications."

162.   One such element of "fundamental fairness," as provided for in the Conduct Process, is the guarantee that "[a]ny interviews conducted by the University Conduct Board will be recorded," and the further guarantee that either party may obtain a written transcript or have access to the recorded interview(s). (*Students Rights and Responsibilities*, 9 ("Fundamental Fairness").)

163.   Such a recording is also, as set forth above, mandated by New York State Law, *see* NY Educ. L. § 6444(5)(b). Its absence is inimical to a fair "hearing," and thus to due process, since the accused has no means of challenging his accuser's testimony if he cannot hear it.

164.   The recording is also the only way for parties to ensure that the hearings conducted by the Conduct Board cover all relevant information, do not exhibit a bias in favor of either party, and do not otherwise violate the Conduct Process.

165.     Perhaps the most glaring error in the Appeals Board's opinion upholding the Board's decision is its utter failure to understand or appreciate the detrimental impact of the University's inability to provide Doe with a recording of Roe's hearing testimony.

166.     The Appeals Board stated, "A technological malfunction occurred during the hearing so that the Complainant's testimony could not be heard. This is not considered a procedural error that would have had a detrimental impact on the outcome of the hearing."

167.     However, as set forth above, without a recording of Roe's testimony or the University Conduct Board's questions and commentary regarding her testimony, there was simply no means by which anyone could determine whether procedural irregularities, or other policy violations, had occurred during the course of Roe's testimony.

168.     Likewise, without a recording of Roe's testimony, there are no means by which anyone could tell whether Roe's story remained consistent in front of the Conduct Board. For example, Roe's story appears to have changed after the Board issued its decision: in her response to Doe's appeal, Roe claimed she was "too drunk to consent to anything." This claim is directly at odds with the investigation and the Board's findings. It is unclear whether Roe maintained this position in front of the Board, and/or whether the Board found that it was not credible (which would, of course, be highly relevant, as the Board did not find most other aspects of Roe's story credible either).

169.     By denying Doe access to the recording, Defendants denied Doe the right to a fair hearing, and thus the right to due process.

**J.     Gender Bias Against John Doe As The Male Accused**

170.     Pursuant to the U.S. Department of Education Office for Civil Rights' Guidelines, Syracuse was required to conduct an impartial and unbiased investigation process.

171.    Upon information and belief, Defendants here have recognized the increased pressure, both internally and from the United States government to aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds.

172.    In fact, Syracuse's response to this pressure, and attempts to avoid rescission of federal funding, is evident from a review of its recent Annual Fire Safety & Security Reports (the "Clery Reports"). Syracuse's Clery Reports dating back to 2013 reveal that the number of forcible sex offenses/rapes reported on Syracuse's campus has steadily increased from three (3) cases in 2013; to nine (9) cases in 2014; to fourteen (14) cases in 2015;  and to fifteen (15) cases in 2016.  Chancellor Defendant Syverud's 30-member Task Force on Sexual and Relationship Violence, established in 2015, was influential in expanding the options for reporting sexual assaults resulting in a steady increase in the number of forcible sex offenses reported annually.

173.    On or about January 17, 2016, the U.S. Department of Education's Office for Civil Rights  opened an inquiry into alleged mishandling of sexual assault investigations by Syracuse University.

174.    On or about June 22, 2016, the Department of Education's Office for Civil Rights notified Defendant Syracuse of a second investigation into the alleged mishandling of a student's complaint of sexual harassment.

175.    On January 24, 2017 and January 25, 2017, representatives from the Department of Education's Office for Civil Rights came to Defendant Syracuse campus to assess and investigate the university's processes for the handling of complaints of sexual violence and harassment.  "The investigation will determine whether SU students are subject to a "sexually hostile environment," announced "The Daily Orange" campus newspaper, alerting the community to the well-publicized visit by investigators for the Office for Civil Rights.

176.    It was during and soon after this assessment visit by investigators from the Office for Civil Rights that Doe's investigative report was finalized and the University Conduct Board hearing was held.

177.    Upon information and belief, it was in part because of the pressure being exerted on Syracuse by the Office for Civil Rights – and the bad publicity the federal investigation garnered on campus and in the community at large, *see*, *e.g.*, *Syracuse University's Handling of Sexual Assault Case Under Investigation*, August 31, 2016 (available at http://www.syracuse.com/su-news/index.ssf/2016/08/syracuse_universitys_handling.html) – that the University sided with Roe and found Doe responsible for violating SU's Policies, <u>even though it could not find two-thirds of Roe's allegations credible</u>.

178.    Plainly, the University simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus that SU was not a safe place for them to be.

179.    Upon information and belief, Defendant Syracuse has repeatedly conducted gender-biased investigations, conducted unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct.

**K.    John Doe Suffers Significant Emotional Damages as a Result of Syracuse's Actions**

180.    Since being subjected to suspension in March 2017, John Doe has suffered grave emotional distress and mental anguish.

181.    During his suspension, Doe began counseling sessions to address the anxieties and stress caused by the disciplinary sanction.

182.    The University Conduct Board's decision to suspend Doe late in the Spring semester only served to exacerbate John Doe's emotional distress.

183.    As a result of Defendants' actions, Doe has suffered and continues to suffer severe and significant emotional damages, including depression, anxiety, social anxiety, and insomnia, for which Doe sought professional help and was prescribed anti-depressant and anti-anxiety medication.

184.    Doe has been irreparably harmed by Defendants' unlawful actions.

### AS AND FOR A FIRST CAUSE OF ACTION
#### Violation of Title IX of the Education Amendments of 1972-
#### Erroneous Outcome (Against Syracuse University)

185.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

186.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

187.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Syracuse.

188.    Upon information and belief, approximately 52 percent of full-time undergraduates at Syracuse receive some kind of need-based financial aid, and the average need-based scholarship or grant award is $29,432. Tuition, room and board for the current 2017-2018 academic year is $62,313. *https://www.usnews.com/best-colleges/syracuse-university-2882/paying*.

189.    The Higher Education Research and Development Survey reported Syracuse University in 2016 spent $69.9M on Research and Development. Compared to other research universities, Defendant Syracuse spent proportionately more on research than similarly ranked

universities. Research and Development sources were as follows: 46% Federal Government funding ($32.4 M); 34% Institutional Funds ($23.9M); 8% State and Local Government ($5.54M); 6% Non-Profit Organizations ($4.49M) and Businesses contributed 5% ($3.61M). *source: http://colleges.startclass.com/l/2983/Syracuse-University*

190.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

191.    An "erroneous outcome" occurred in this case.  John Doe was innocent and wrongly found to have committed a violation of Syracuse's Policies, and gender bias was a motivating factor.

192.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[4]

193.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

---

[4] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[5]

194.    Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of the Roe complaint.

195.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon John Doe. These circumstances include, without limitation:

   a.   the investigator, Defendant Jacobson, accepted Jane Roe's allegations of sexual misconduct at face value prior to hearing John Doe's version of the events, and he did so because, on information and belief, his prior career as an advocate for victims of sexual assault predisposed him to immediately believe the story of a female accuser;

   b.   the investigator, Defendant Jacobson, assisted Jane Roe in developng her story and accepted, without question, major changes in that story, including most particularly the fact that Roe at first said she consented to the vaginal sexual intercourse and then changed her story to say that while she initially consented, she withdrew her consent. Jacobson did so because, on information and belief, his prior career as an advocate for victims of sexual assault predisposed him to believe the accusations of a female victim over the denials of the accused male;

   c.   the investigator and Defendant Syracuse, through the University Conduct Board and Appeals Board, disregarded and explained away fatal inconsistencies in Jane Roe's statements to avoid finding her less credible, and they did so based at least in part on their utilization of the so-called "trauma-informed approach," which is specifically designed to attempt to credit the female complainant's version of events, even when that version is inconsistent or unbelievable, and to discredit the male respondent's version of events;

   d.   the investigator and Defendant Syracuse, through the University Conduct Board and Appeals Board, relied upon documents not disclosed to John Doe prior to the hearing and credited at least one of those documents as a medical opinion, even

---

[5] *Id.* at 20.

though it was simply a nurse's recitation of Roe's allegations and contained no medical test results or findings; and

e.   Defendants demonstrated a presumption of guilt against John Doe by finding him less credible merely because he denied that Roe withdrew consent during their sexual encounter. In so doing, Defendants showed extraordinary gender bias, since they inexplicably continued to credit Roe even after finding two of her three allegations against Doe unsupported by the evidence. The only possible explanation for these skewed credibility assessments is gender bias.

f.   Defendants' erroneous and unsupportable decision to find Doe responsible for sexual assault and suspend him from the University occurred at a time when the University was being investigation by the Office for Civil Rights for its alleged failures to adequately address female students' complaints of sexual misconduct.

196.   Further, upon information and belief, Defendant Syracuse was encouraged by federal officials during the Obama Adminstration to institute disciplinary procedures in sexual misconduct cases that abrogate the civil rights of men and treat men differently than women. Defendant Syracuse did so and has not modified its disciplinary procedures under the present Trump Administration.

197.   Upon information and belief, Defendant Syracuse possesses communications evidencing Defendants' predisposition to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

198.   Upon information and belief, Defendant Syracuse has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

199.   Upon information and belief, Defendant Syracuse's mishandling of Roe's complaint was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

200.    Based on the foregoing, Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

201.    As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

202.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of the New York State Constitution (Art. I, § 6, Due Process)**
**(All Defendants)**

203.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

204.    Pursuant to the New York State Constitution, Doe cannot be deprived of life, liberty or property without due process of law.

205.    By virtue of Art. 129, through which New York State has significantly involved itself and become a meaningful participant in otherwise private conduct, Defendant Syracuse and its agents and employees, including the named defendants, are state actors.

206.    As a direct result of Defendants' actions, which they undertook under the color of state law, Doe has suffered a loss of his protected liberty interest in his good name, reputation, honor, and integrity, coupled with the loss of his good standing as a student at Syracuse University.

207.     By mandate of New York State law, Doe's transcript now reflects that he was suspended for a code of conduct violation.

208.     As set forth in detail above, Defendants deprived Doe of his liberty interests, and caused him resulting reputational and tangible harm, without due process of law.

209.     Defendants failed to adequately notify Doe of the charges against him, and failed to provide Doe a fair hearing.

210.     As a direct and proximate result of Defendants' conduct, Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

211.     As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract (Against Defendant Syracuse)

212.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

213.     At all times relevant hereto, a contractual relationship existed between Syracuse and John Doe through Syracuse's Policies and procedures governing the student disciplinary system, including but not limited to the Code of Conduct.

214.     Through the documents it publishes and provides to students, Defendant Syracuse makes express contractual commitments to students involved in a disciplinary process.

215.     Based on the foregoing, Syracuse created express and implied contracts with John Doe.

216.    The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

217.    Based on the aforementioned facts and circumstances, Defendant Syracuse breached its agreement(s) with John Doe and the implied covenant of good faith and fair dealing therein.

218.    Defendant Syracuse committed several breaches of its agreements with John Doe during the investigation and hearing process, including, without limitation:

a)  discriminating against Doe on the basis of his gender, as set forth above, in violation of *Student Rights and Responsibilites*, 2 ("Non-Discrimination), which breach caused the aforementioned harm to Doe;

b)  violating Doe's right to fundamental fairness, as provided for in the Student Rights and Responsibilities, 9 ("Fundamental Fairness"), by failing to record and/or provide Doe with a recording of Roe's hearing testimony, as required under the *Student Conduct Procedures*, 10.8, which breach caused the aforementioned harm to Doe;

c)  failing to provide Doe with "the relevant facts and circumstances learned during the course of the invesgitation," as provided for in the *Student Conduct Procedures*, 10.8, which breach caused the aforementioned harm to Doe; and

d)  failing to adhere to the "preponderance of evidence" standard, as set forth in the *Student Conduct Procedures*, 5.3, which breach caused the aforementioned harm to Doe.

219.    Based on the aforementioned facts and circumstances, Defendant Syracuse breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with John Doe.

220.    As a direct and foreseeable consequence of the foregoing breaches, John Doe sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

221.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial.

### AND AS FOR A FOURTH CAUSE OF ACTION
### Breach of Contract/Common Law: Denial of Basic Fairness/
### Arbitrary and Capricious Decision Making
### (Defendants Syracuse University and Syracuse Board of Trustees)

222.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

223.    Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against John Doe were conducted in good faith and with basic fairness.

224.    Defendants breached this duty of good faith and basic fairness by, without limitation:

- Failing to provide specific notice to Doe of the allegations against him, thereby depriving him of an opportunity to test those allegations and counter them during the proceedings, particularly as the allegations changed from one interview to the next;

- Considering evidence at the hearing that was not provided to Doe prior to the hearing, including a nurse's letter that merely documented Roe's allegations and provided no medical findings or opinions;

- Employing a method of investigation and adjudication – the so-called "trauma-informed approach" – specifically designed to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused;

- Failing to provide Doe the opportunity to be heard in front of a fair and impartial tribunal;

- Failing to provide Doe the opportunity to confront and cross-examine witnesses at a fair hearing;

- Arbitrarily and capriciously finding that Roe withdrew her consent to intercourse, when Roe's two other allegations of nonconsensual contact – oral sex and anal sex – were, as the Board found, wholly unsupported by the record and not credible (or credited);

- Failing to record Roe's testimony, in direct violation of New York State law;

- Arbitrarily and capriciously suspending Doe for an indefinite period of time.

225.   Defendants' breach of the duty to ensure basic fairness proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

226.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
### Promissory Estoppel (Against Defendant Syracuse)

227.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

228.   Defendant Syracuse's Policies constitute unambiguous representations and promises that Syracuse should have reasonably expected to induce action or forbearance on the part of John Doe.

229.   Defendant Syracuse expected or should have expected John Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against

him under the Campus Code of Conduct be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

230.    John Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Defendant Syracuse, by choosing to attend Syracuse rather than other schools of equal caliber.

231.    These express and implied promises and representations made by Syracuse must be enforced to prevent substantial injustice to John Doe.

232.    Based on the foregoing, Defendant Syracuse is liable to John Doe based on promissory estoppel.

233.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

234.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, John Doe demands Judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a declaratory judgment per 28 U.S.C. § 2201 that Defendant Syracuse violated Title IX by erroneously finding John Doe responsible for sexual misconduct in violation of Defendant Syracuse's Policy and unjustly severely sanctioning him with an indefinite suspension, a judgment awarding John Doe damages in an amount to be determined at

trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and further awarding a permanent injunction as stated in subparagraph (vi) below;

(ii)     on the second cause of action for a violation of the New York State Constitution, a declaratory judgment per 28 U.S.C. § 2201 that Defendant Syracuse violated Art. I, § 8 of the New York State Constitution by denial of procedural due process, a monetary judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and a judgment awarding a permanent injunction as stated in subparagraph (vi) below;

(iii)     on the third cause of action for breach of contract, a declaratory judgment per 28 U.S.C. § 2201 that Defendant Syracuse breached its contract with John Doe, a monetary judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iv)     on the fourth cause of action for denial of basic fairness under contract and common law, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career

opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for promissory estoppel, a declaratory judgment per 28 U.S.C. § 2201 that Defendant Syracuse is subject to promissory estoppel, a monetary judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational opportunities, and loss of future career prospects;

(vi)     a permanent injunction that: (i) the outcome and findings made against John Doe by Defendant Syracuse be vacated; (ii) John Doe's disciplinary record be expunged of all references to the disciplinary case; (iii) all records related to John Doe's suspension and probation from Syracuse be removed from his education file; (iv) any record of the complaints filed against John Doe be permanently destroyed; and (v) Syracuse's Policy applicable at the time of John Doe's case is unconstitutional as applied; and

(vii)     awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         March 26, 2018

                                     Respectfully submitted,

                                     NESENOFF & MILTENBERG, LLP
                                     *Attorneys for Plaintiff*


                                     By:/s/ Andrew T. Miltenberg
                                     Andrew T. Miltenberg, Esq. (517014)
                                     Stuart Bernstein, Esq. (520831)
                                     Philip A. Byler, Esq. (520921)
                                     363 Seventh Avenue, Fifth Floor
                                     New York, New York 10001
                                     (212) 736-4500
                                     amiltenberg@nmllplaw.com
                                     sbernstein@nmllplaw.com
                                     pbyler@nmllplaw.com