# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHN DOE**, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 5:18-CV-0377 |
| ) | (DNH/DEP) |
| **SYRACUSE UNIVERSITY, SYRACUSE** ) | Hon. David N. Hurd |
| **UNIVERSITY BOARD OF TRUSTEES**, **KENT** ) | Mag. David E. Peebles |
| **SYVERUD**, in his individual capacity, **PAMELA** ) | |
| **PETER**, in her individual capacity, **SHEILA** ) | **DEFENDANTS'** |
| **JOHNSON-WILLIS**, in her individual capacity, and ) | **MEMORANDUM IN SUPPORT** |
| **BERNERD JOHNSON**, in his individual capacity, ) | **OF MOTION TO DISMISS** |
| ) | |
| Defendants ) | |
| ) | |

Jeremy M. Creelan
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
(212) 891-1678
jcreelan@jenner.com
*Attorney for Defendants*

David W. DeBruin
Ishan K. Bhabha
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412
(202) 639-6015
ddebruin@jenner.com
*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

        A.      Complaint of Sexual Assault And The University's Investigation......................... 2

        B.      Hearing And Decision Of University Conduct Board. .......................................... 5

        C.      Appeal And Decision Of Appeals Board................................................................ 7

        D.      Doe's Asserted Claims For Relief. ........................................................................ 8

ARGUMENT .............................................................................................................................. 8

I.       Standard Of Review.................................................................................................... 8

II.      Doe Has Failed To Plead An Adequate Claim Under Title IX..................................... 9

        A.      Doe Has Not Set Forth Adequate, Plausible Allegations That The University Reached An Erroneous Result In His Case........................................... 9

        B.      Doe Also Has Not Set Forth Adequate, Plausible Allegations That Any Erroneous Outcome In This Case Resulted From Gender Bias............................ 16

III.     Doe's New York State Constitutional Claim, Count Two, Fails As A Matter of Law. ......................................................................................................................... 20

IV.    Doe's Breach Of Contract Claims, Counts Three And Four, Also Are Inadequate. ........ 21

V.     Doe's Promissory Estoppel Claim, Count Five, Which Is Derivative Of His Other Allegations, Also Fails.......................................................................................... 25

CONCLUSION.......................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

CASES

*2 Broadway L.L.C. v. Credit Suisse First Boston Mortgage Capital L.L.C.*, No. 00 CIV. 5773 GEL, 2001 WL 410074 (S.D.N.Y. Apr. 23, 2001)................................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................................15

*Austin v. University of Oregon*, 205 F. Supp. 3d 1214 (D. Or. 2016) ...........................................20

*Baldridge v. State*, 740 N.Y.S.2d 723 (N.Y. App. Div. 3d Dep't 2002) .......................................21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)....................................................................8

*Cooper v. United States Postal Service*, 577 F.3d 479 (2d Cir. 2009) ..........................................20

*Cranley v. National Life Insurance Co. of Vermont*, 318 F.3d 105 (2d Cir. 2003) ......................20

*Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016)..................................................10, 16, 18

*Doe v. Cornell University*, 70 N.Y.S.3d 750 (N.Y. Sup. Ct., Tompkins Cty. 2017)..............20, 21

*Doe v. Skidmore College*, 59 N.Y.S.3d 509 (N.Y. App. Div. 3d Dep't 2017) ........................21, 24

*Faiaz v. Colgate University* 64 F. Supp. 3d 336 (N.D.N.Y. 2014)................................................21

*Gally v. Columbia University*, 22 F. Supp. 2d 199 (S.D.N.Y. 1998) ......................................21, 24

*Gupta v. Headstrong, Inc.*, No. 17-CV-5286 (RA), 2018 WL 1634870 (S.D.N.Y. Mar. 30, 2018)..................................................................................................................15

*Gurreri v. Associates Insurance Co.*, 669 N.Y.S.2d 629 (N.Y. App. Div. 2d Dep't 1998) ..............................................................................................................................25

*Haag v. MVP Health Care*, 866 F. Supp. 2d 137 (N.D.N.Y. 2012) ................................................8

*Jacobson v. Blaise*, 69 N.Y.S.3d 419 (N.Y. App. Div. 3d Dep't 2018) ........................................20

*Jevelekides v. Lincoln National Corp.*, No. 3:14-CV-1517 LEK/DEP, 2015 WL 3849312 (N.D.N.Y. June 22, 2015).............................................................................................2

*Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018) ....................................................................................8

*Nungesser v. Columbia University*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016) .....................21, 22, 23

*Prasad v. Cornell University*, No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016)..........................................................................................................10, 11, 13, 16

*Rolph v. Hobart and William Smith Colleges*, 271 F. Supp. 3d 386 (W.D.N.Y. 2017) ........................................................................................................17

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)............................................................2

*Sharrock v. Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152 (1978) .....................................20

*Stuart v. Palmer*, 74 N.Y. 183 (1878)........................................................................20

*TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588 (S.D.N.Y. 2013).............................2

*Wojchowski v. Daines*, 498 F.3d 99 (2d Cir. 2007) ......................................................9

*Wood v. Strickland*, 420 U.S. 308 (1975) ....................................................................9

*Yu v. Vassar College*, 97 F. Supp. 3d 448, 462-463 (S.D.N.Y. 2015)..........9, 21, 22, 25

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994) ...........................9, 10, 13, 16, 17

## STATUTES

20 U.S.C. §§ 1681-1688 ................................................................................................2

N.Y. Educ. Law § 129-B ..............................................................................................20

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)................................................................................................8

https://news.syr.edu/2017/02/university-faculty-staff-receive-training-on-investigating-complaints-of-sexual-violence-title-ix-compliance/ ...................18, 19

The Chronicle of Higher Education, Title IX Tracking Sexual Assault Investigations, https://projects.chronicle.com/titleix/ .........................................19

## INTRODUCTION

Universities receive an increasing number of complaints of sexual assault brought by students against other students, and they resolve these complaints under university codes of conduct that ensure a safe and non-hostile environment for all students.  At the same time, there has been a dramatic increase in the number of federal court complaints filed by students disciplined for sexual misconduct.  But federal courts do not – and should not – sit to provide an automatic appeal in every university student misconduct proceeding.  At bottom, Plaintiff John Doe ("Doe") simply disagrees with the finding of misconduct in his case, and his Complaint is bereft of allegations that give rise to any federal or state law cause of action.

Doe ultimately complains that he should not have been disciplined for a sexual encounter with another student that began as consensual.  But the university's code of conduct – like the law of sexual assault, generally – is clear:  consent to sexual activity may be withdrawn at any time, and once consent is withdrawn, that withdrawal of consent must be respected.  Syracuse University found, after following adequate procedures and based on sufficient facts, that Doe violated that basic rule.

Complainant alleged non-consensual oral, vaginal, and anal sex, and the University only found non-consensual vaginal sex.  Because of this, Doe contends the University found Complainant not credible and thus could only have disciplined him because of an anti-male bias. For one, the University Conduct Board expressly found that Complainant *was* credible, even though the evidence was insufficient to find that she communicated a lack of consent to oral sex, or that anal sex had occurred.  But, more important, Doe's allegations show just the opposite of the bias he alleges.  That the Board did not find sufficient evidence to sustain all of Complainant's allegations – which, if it had, would have warranted a more severe sanction – shows that the Board

did not simply accept Complainant's allegations out of a pro-female bias.  Undoubtedly, if the Board had ruled against Doe on *all* claims, he would have alleged that such a ruling *also* was the result of bias.  The law is clear that more is needed to adequately allege sexual bias under Title IX, 20 U.S.C. §§ 1681-1688.  Doe also raises that a University recording system failed during Complainant's testimony.  This technical malfunction does not entitle Doe to relief, and, in any event, the University offered Doe to conduct an entirely new hearing because of the problem.

With regard to these and other contentions, Doe simply reargues that he did not commit a sexual assault – which gives rise to no claim.  His Complaint should be dismissed.

## <u>BACKGROUND</u>

The following facts may be accepted as true based on the allegations in the Complaint, as well as the documents referenced in the complaint.[1]

**A.    Complaint Of Sexual Assault And The University's Investigation.**

"Jane Roe" ("Complainant" or "Roe") filed a complaint of sexual assault against Plaintiff John Doe ("Doe") with the University.  Complaint, ECF No. 1 ("Compl."), ¶ 1.  As Doe alleges, the University investigated the incident, interviewing Complainant, Doe, and nine other students, and compiled an "investigative report."  *Id.*, ¶¶ 7, 68, 70, 89, 102 (quoting portions of report).  *See*

---

[1] When assessing the facts as pleaded in a complaint, the Second Circuit has "deemed a complaint to include . . . any statements or documents incorporated in it by reference, . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000) (citations omitted).  On a motion to dismiss where a document cited in the complaint is inconsistent with the allegations set forth in the complaint, "the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (quotation marks omitted); *see also Jevelekides v. Lincoln Nat'l Corp.*, No. 3:14-CV-1517 LEK/DEP, 2015 WL 3849312, at *1 n.6 (N.D.N.Y. June 22, 2015) ("When a plaintiff's allegations are inconsistent with documents incorporated by reference, the documents shall control.").

Report of Investigation, attached as Ex. A ("Report") at 3.[2]  In his Complaint, Doe selectively relies on these witness statements.  Compl., ¶¶ 68, 70.

Complainant and Doe agreed in their statements that they met with other friends at a bar, where Complainant stated she had a significant amount to drink, before they went to Roe's dormitory suite.  Report, Attachments at 1, 6.  Complainant and Doe kissed in the common room of the suite.  *Id.*  Although Roe's roommates originally were present, they moved to an adjoining bedroom.  Still in the common room, Complainant performed oral sex on Doe; later, after Roe asked her roommates to leave the bedroom, Complainant and Doe engaged in vaginal sex there.  *Id.*  On all this, both parties agreed; they disagreed whether the sexual activity was consensual.

Complainant said in her statement that Doe "made me" give him oral sex.  Report, Attachments at 1.  But she did not claim she told Doe "no" with regard to the oral sex, and her own statement describes that "he pressed hard to move her head but she did not pull back."  *Id.*  In addition, Complainant agreed that she asked her roommates to leave the bedroom, and she and Doe went into her room and began to have vaginal sex.  *Id.*, Attach. at 1-2.  With regard to the vaginal sex, however, Complainant told the Investigator that she verbally said to Doe, "Stop, I'm too drunk" – but "he just kept going."  *Id.*  She also said that she said "stop" a second time, and Doe responded "don't worry just close your eyes and go to bed and you'll be fine."  *Id.*  Complainant further described that Doe "tried to do anal" and that "he just did it."  *Id.*  Doe ejaculated, the sexual activity ended, and Doe left.  *Id.*

---

[2] Because plaintiff has moved to proceed using a pseudonym, student names in the Report and other documents attached to this memorandum are redacted.

Doe claimed that all of the sexual activity was consensual, and flatly denied there had been anal sex. *Id.*, Attach. at 6-8. His detailed account of the incident was included in the Report, which he characterized as a "fair write up." *Id.*, Attach. at 9.

Many facts were corroborated by other witnesses. One of Roe's roommates confirmed that Complainant asked her to leave the bedroom, and said it was "pretty clear what they were going to do and Complainant seemed ok with it." *Id.*, Attach. at 11; Compl., ¶ 68. But the same roommate also reported that after Doe left, Complainant was crying and very upset. Report, Attach. at 10. Similarly, Complainant's other roommate, who also had been asked to leave the bedroom, said that "I did hear stuff, like sex noises, but nothing unusual." *Id.*, Attach. at 18; Compl., ¶ 70. But this roommate also described that "right after [Doe] left the room," Complainant was crying and said, "I feel like something just happened that shouldn't have happened," and that Complainant said she told Doe to stop but he kept going. Report, Attach. at 18.

Shortly after the incident, Roe wrote an account of what had occurred to an acquaintance to whom she turned for advice. This correspondence was included in the investigation report. Report, Enclosure B. In that account, Complainant described that during the vaginal sex, "I told him to stop because I realized I was way too drunk and he just ignored me and just kept like going faster." *Id.* Complainant also wrote that a second time "I told him to stop and he said 'don't worry just close your eyes and go to bed and you'll be fine' and that is the last thing I remember really." *Id.* Complainant filed a complaint of sexual assault several weeks later. Report at 1, 4.

The Investigator compiled all the evidence in the Report, without making any conclusion. The Investigator also included a "Credibility Assessment" of each witness. The Investigator wrote: "Complainant presented as genuine and sincere, she was responsive to questioning and did not attempt to shade unfavorable, or embarrassing, details in her favor." *Id.* at 9. The Investigator

also reported that "Respondent [Doe] was cooperative and provided information openly and sincerely." *Id*. at 10. Although Doe "was somewhat agitated and aggrieved," the Investigator concluded that his "demeanor was not inappropriate." *Id*. The Investigator found that Doe's "version of events is plausible and largely corroborated by other witnesses, the exception being the issue of consent central to this investigation." *Id*. The Investigator concluded that Doe's "statements are assessed as generally reliable:  his responses are not deceptive but on occasion lack specificity which limits their utility." *Id*. at 11.

## B.   Hearing And Decision Of University Conduct Board.

As alleged in the Complaint, once the Investigator completed the investigation, the Report was provided to a three-person University Conduct Board, along with written responses to the Report from Complainant and Doe.  Compl., ¶ 103.  The Conduct Board held a hearing at which Complainant and Doe appeared separately to present additional information they believed relevant to the case. *Id*., ¶¶ 105, 111.  Ten days later, the Board issued its unanimous decision. *Id*., ¶ 117. Doe quotes the decision at length in the Complaint. *Id*., ¶¶ 113, 115, 117-118, 120-123, 125-126, 136. *See* University Conduct Board Hearing Opinion, attached as Ex. B ("Conduct Bd. Op.").

As reflected in the Conduct Board Opinion, Doe himself offered the Investigative Report (which he now contends was biased) in support of his defense.  Conduct Bd. Op. at 6.  In its opinion, the Conduct Board made detailed findings of fact that are important and directly pertinent to Doe's claims. *Id*. at 7.

With regard to Complainant's allegation of non-consensual oral sex, the Board found:

Respondent and Complainant were kissing in common area.  After the others left, sexual activity, including oral sex, occurred in the common space.  Based on all of the evidence, the Board finds that the sexual activity in the common space was consensual, and the Complainant demonstrated consent through her actions in the common space. *Id*. at 7, ¶ 3.

With regard to Complainant's allegation of non-consensual vaginal sex, the Board found:

> In the bedroom, Complainant and Respondent began engaging in sexual intercourse. We find that the Complainant consented to the initiation of sexual activity, including sexual intercourse. However, while the intercourse was occurring, Complainant said stop twice, but Respondent continued the sexual intercourse after both requests that he stop. *Id.*, ¶ 5.

With regard to anal sex, the Board found:

> The Board was unable to determine if anal sex occurred. The Complainant stated the anal sex took place, however the medical document that Complainant submitted noted vaginal bleeding, not anal bleeding. Due to this, the Board could not make a decision finding based on a preponderance of the evidence. *Id.*, ¶ 6.

> The Board also made specific findings regarding party credibility. With regard to

Complainant, the Board found:

> We find that the Complainant was credible as her statements were consistent throughout the process and we found her credible when she answered questions before the Board and confirmed she had twice requested that Respondent cease the sexual intercourse. We found her statement to the Board that Respondent continued the sexual intercourse after her two requests that he stop to be credible. *Id.*, ¶ 7.

With regard to Doe, the Board found:

> We find the Respondent partially credible based on his demeanor and evasive answers during the hearing. Multiple times when the Board posed questions to the Respondent, he answered by referencing other people's statements rather than responding with his own recollection. We found his denial that Complainant revoked any consent she had given for the sexual activity not to be credible. *Id.*, ¶ 8.

In a "case analysis" section of the opinion, the Board explained:

> The facts of the case were determined by the consistencies represented in the Complainant's and Respondent's statements and the Report of Investigation, along with supporting statements of the witnesses. The key component of the case was in the bedroom in which the Board evaluated the responses, statements, and credibility of the Respondent and Complainant and found it more likely than not that consent was withdrawn by Complainant and that Respondent continued sexual intercourse after consent was withdrawn. Furthermore, the Complainant's timeline of reporting and actions throughout the process are consistent with a traumatic event such as she described in her statement. *Id.*

The Board also articulated the rationale for its decision:

> Consent can be initially given but withdrawn at any time during sexual activity. While engaging in vaginal intercourse, the Complainant withdrew consent by saying 'stop' twice at which point the Respondent continued. This meets the definition of sexual assault. Because of this, we find that the Respondent's actions of continuing to perform intercourse after Complainant's requests that he stop violated sections 1, 3 and 15 of the Code of Student Conduct. *Id.*, ¶ 9.

In terms of sanction, the Board concluded that a suspension, rather than expulsion, was appropriate. *Id.* The Board explained:

> The Respondent has no prior history with the conduct system. Further, while we find that the Complainant revoked consent, we did also find that the sexual contact was initially consensual. The sanction we recommend is nevertheless significant . . . . When consent is withdrawn, all sexual activity must cease. *Id.*, ¶¶ 9-10.

## C.  Appeal And Decision Of Appeals Board.

Doe appealed the Conduct Board decision to a separate three-person Appeals Board. Compl., ¶ 153. Doe requested a transcript of the hearing conducted by the Conduct Board. *Id.*, ¶ 150. As a result of technical difficulties, Complainant's testimony before the Conduct Board was not recorded. *Id.*, ¶ 155. Doe nevertheless submitted his appeal based on the decision of the Conduct Board, described above, which he had received. *Id.*, ¶¶ 117, 153.

The Appeals Board unanimously upheld the decision of the Conduct Board. *Id.*, ¶ 165. Doe references and quotes the decision of the Appeals Board. *Id.*, ¶¶ 165-166. *See* University Appeals Board Hearing Opinion, attached as Ex. C ("Appeals Bd. Op."). The Appeals Board addressed Doe's numerous procedural and substantive challenges to the University's investigatory process and the Conduct Board decision. *Id.* With regard to Doe's allegation that he was prejudiced on appeal by the fact that Complainant's hearing testimony had not been recorded, the Appeals Board concluded:

A technological malfunction occurred during the hearing so that the Complainant's testimony could not be heard.  This is not considered a procedural error that would have had a detrimental impact on the outcome of the hearing.  *Id.*, ¶ 7.

In his Complaint, Doe continues to assert claims based on the failure of the University's recording equipment.  Compl., ¶¶ 150-169.  However, after the conclusion of Doe's disciplinary proceeding, and in light of the malfunction of the equipment, the University offered Doe a new hearing before the Conduct Board.  *See* Declaration of Gabriel Nugent, attached as Ex. D, ¶ 6.

**D.     Doe's Asserted Claims For Relief.**

In his Complaint, Doe asserts five claims for relief:  (1) a federal claim alleging the University was biased against Doe because he is male, in violation of Title IX; (2) a state claim alleging a denial of due process, as guaranteed by the New York Constitution; (3) a state claim alleging breach of contract; (4) an additional state claim alleging breach of contract/common law; and (5) a state claim alleging promissory estoppel.  On the basis of the allegations and documents referenced in the Complaint, each of these claims fails as a matter of law.

## ARGUMENT

**I.     Standard Of Review.**

Under Fed. R. Civ. P. 12(b)(6), a motion to dismiss should be granted unless the factual allegations in the complaint "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' more than mere conclusions are required."  *Haag v. MVP Health Care*, 866 F. Supp. 2d 137, 140-41 (N.D.N.Y. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).  Thus, "[t]o survive a motion to dismiss, a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)).  Moreover, "even if all of the allegations contained in a complaint are true," a complaint must nonetheless be dismissed if the claims "fail[] as a matter of law."  *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007).

## II.     Doe Has Failed To Plead An Adequate Claim Under Title IX.

Doe asserts a claim under the "erroneous outcome" theory of Title IX.  Compl. ¶ 32 (heading).  To proceed under that theory, Doe must adequately allege both an erroneous outcome, and that the outcome resulted from gender bias.  *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  Doe's Complaint is inadequate on both accounts.

### A.     Doe Has Not Set Forth Adequate, Plausible Allegations That The University Reached An Erroneous Result In His Case.

The non-discrimination provisions of Title IX do not require federal courts to reevaluate every student misconduct proceeding to ensure the court agrees with the outcome.  To the contrary, courts give significant deference to disciplinary determinations regarding student conduct.  *See*, *e.g.*, *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("Given the fact that there was evidence supporting the charge against respondents, the contrary judgment of the Court of Appeals is improvident.  It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.").  This deference is all the more appropriate in the context of a private university, like Syracuse.  *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462-463 (S.D.N.Y. 2015).

Concomitant with the level of deference that exists, the Court of Appeals has held that in the context of Title IX, it is not sufficient for a plaintiff merely to dispute the outcome of a disciplinary proceeding to survive a motion to dismiss.  Rather, a plaintiff first must "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."  *Yusuf*, 35 F.3d at 715.  And the court went further to explain that such

a showing could be made by, for example, alleging "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses," "particularized strengths of the defense," or a "procedural flaw affecting the proof." *Id*.

Cases from the Second Circuit and this Court are instructive in demonstrating the specificity of allegations required to satisfy this part of the pleading burden.  For example, in *Yusuf*, the Court of Appeals underscored that the complaint of sexual harassment was brought only after the plaintiff had filed criminal charges against the complainant's boyfriend following a brutal physical assault.  *Id.* at 716.  The unique circumstances of the case, coupled with procedural irregularities during the disciplinary hearing, *id*. at 712-713, gave rise to a plausible allegation that the outcome of the disciplinary proceeding was simply wrong.  Similarly, in *Columbia*, the plaintiff's detailed allegations allowed the Court to conclude that "the evidence substantially favors one party's version of a disputed matter, but [the] evaluator form[ed] a conclusion in favor of the other side."  *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016).  The allegations and undisputed facts in *Columbia*, on their face, again gave serious reason to question the outcome of the proceeding, which also involved procedures that had significantly advantaged the complainant. *See id*. at 49-50.  And in *Prasad v. Cornell University*, No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016), this Court found the plaintiff had alleged "a host of facts demonstrating particular evidentiary weaknesses in the case against him," including that "the investigators failed to question certain witnesses about [complainant's] outward signs of intoxication; accepted the victim's account of her level of intoxication despite numerous statements to the contrary; misconstrued and misquoted witnesses' statements; . . . accepted [complainant's] statement that she allowed Plaintiff to sleep in her bed because of her family's 'sailboat community values'; drew

10

prejudicial conclusions without sufficient evidentiary support; and cast Plaintiff's actions in highly inflammatory terms." *Id.* at *15.

The Complaint in the instant case contains none of the detailed allegations present in *Yusuf*, *Columbia*, and *Prasad* to plausibly suggest that the University's adjudication of misconduct was simply wrong. Doe does not allege that witness statements were misquoted or misconstrued, or that critical witnesses were simply ignored. He does not identify any basis Complainant had to fabricate her story (as in *Yusuf* and *Columbia*), nor any physical or other evidence that calls her claims into question (as in *Prasad*). On the central, dispositive issue of whether Complainant twice told Doe to "stop" during vaginal intercourse – on which the Conduct Board heard directly from both parties – Doe simply contends the Conduct Board should have believed him and not Complainant. But it is clear from the Investigation Report, which Doe references in his Complaint, that Complainant has said she told Doe to "stop" from the moment Doe left her dormitory suite that night, and consistently since then.

Doe's primary allegation that the outcome of his case was flawed is that "notwithstanding the fact that the Board could not find Roe's account of the oral sex credible, nor could it find that the alleged anal sex had even taken place, it inexplicably concluded that one small piece of Roe's otherwise clearly fabricated narrative – that she initially consented to vaginal intercourse but withdrew her consent during the act – was somehow credible." Compl., ¶ 122; *see also id.*, ¶¶ 6, 139. But the allegation is inadequate on its face to raise a plausible claim of an erroneous outcome.

For one, contrary to Doe's allegations, the plain text of the Conduct Board's decision makes clear it did *not* find Complainant to be "not credible." The Board expressly found that "Complainant *was* credible as her statements were consistent throughout the process and *we found her credible* when she answered questions before the board and confirmed she had twice requested

that Respondent cease the sexual intercourse."  Conduct Bd. Op., Ex. B, at 3 (emphasis added).

And there is nothing "inexplicable" about this conclusion.  Although Complainant expressed that

Doe "forced" her to perform oral sex, her own statement acknowledged she did not *verbally*

indicate she did not consent and she also "did not pull back."  Report, Ex. A, Attach. at 1.  In

contrast, during the vaginal sex, Complainant described that she affirmatively said "stop" twice,

and Doe did not stop.  *Id*., Attach. at 2.  Moreover, this fact was corroborated by her roommate

(upon whom Doe otherwise relies, Compl., ¶ 70), who described Complainant as very upset after

the incident and immediately said she had told Doe to stop.  Report, Ex. A, Attach. at 18.

Based on these facts – all incorporated in and part of Doe's Complaint – there is nothing

inconsistent or "inexplicable" in the Conduct Board's conclusion that the allegation of non-

consensual *oral* sex was not sufficiently established by a preponderance of the evidence, but the

allegation of non-consensual *vaginal* sex *was* sufficiently established.  The issue of whether or not

Complainant felt "forced" to perform oral sex is distinct from the issue of whether or not there was

an adequate *expression* of non-consent to oral sex, in the course of otherwise consensual activity.

Indeed, it is ironic that Doe alleges an "erroneous outcome" from the fact that the Board was

rigorous in its demand of proof of non-consent, which served only to benefit Doe.  As the Board

explained, it imposed a sanction of "suspension . . . rather than expulsion" in part because "while

we find that the Complainant revoked consent, we did also find that the sexual contact was initially

consensual."  Conduct Bd. Op., Ex. B, at 9.

Doe's allegation regarding anal sex is even further afield.  The Board did not find

Complainant not credible, nor that anal sex did not occur.  Rather, in light of Doe's denial, the

Board concluded it was "unable to determine if anal sex occurred," because the corroborating

"medical document that Complainant submitted noted vaginal bleeding, not anal bleeding."  *Id.*

at 3.   Again, the fact that the Board reviewed the evidence – including Doe's own testimony – carefully, and applied a burden of proof before finding misconduct, hardly "cast[s] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," *Yusuf*, 35 F.3d at 715, or is indicative of "particular evidentiary weaknesses" in the Board's conclusion, *Prasad*, 2016 WL 3212079, at \*15.   Indeed, it is directly to the contrary.

Doe's allegations regarding the investigation conducted by Defendant Jacobson are similarly insufficient to present a plausible allegation of an erroneous outcome.   Doe alleges at a high level of generality that "Jacobson acted not as a neutral investigator, but as a prosecutor and advocate developing a case for the 'victim.'"   Compl., ¶ 92.   But rhetoric aside, the claim is belied by the face of the Investigative Report.   Jacobson included a detailed summary of Doe's version of the incident, which Doe himself characterized as a "fair write up."   Report, Ex. A, Attach. at 9. Jacobson expressly found Doe's version of the events "plausible and largely corroborated by other witnesses, the exception being the issue of consent central to this investigation," *id.* at 10, and concluded that Doe's statements were "generally reliable:  his responses are not deceptive but on occasion lack specificity which limits their utility," *id.* at 11.

Doe alleges that he learned in a meeting with Jacobson that Complainant had "first said the vaginal intercourse with Doe was consensual, but the oral and alleged anal sex were not.  Yet Roe later claimed, in a subsequent interview with Jacobson, that she had actually withdrawn consent during the vaginal intercourse."   Compl., ¶ 85.   Doe alleges that notwithstanding "these glaring inconsistencies in Roe's accounts of her encounter," Jacobson "inexplicably treated Roe's testimony as consistent."   *Id.*, ¶ 94.   But this double-hearsay allegation of what Complainant allegedly told Jacobson, and Jacobson told Doe, is not sufficient to raise a plausible claim of an erroneous outcome here.   At the outset, Jacobson's Report identifies only one interview with

13

Complainant, in which she stated she said "stop" twice during the vaginal intercourse.  Report, Ex. A, at 3, Attach. at 2.  In addition, the Report shows that Complainant stated that she said "stop" during the vaginal intercourse both immediately after Doe left her dormitory suite, *id*., Attach. at 18, and also in her initial detailed write-up of the incident, *id*., Enclosure B – both of which occurred *before* Complainant reported the incident to the University and ever met with Jacobson.  Thus, the allegations made and incorporated into the Complaint do not plausibly suggest Complainant originally contended the vaginal sex was consensual throughout.[3]  Moreover, Doe concedes he *knew* (based on what Jacobson allegedly told him) of this supposed inconsistency from the outset, and thus had an opportunity to offer it as a reason why Complainant's account should not be credited by the Board.  The fact that the Board nonetheless found Complainant to be credible does not demonstrate an evidentiary flaw in its decision.[4]

Finally, Doe alleges a procedural irregularity, purportedly causing an erroneous outcome, because Complainant's testimony before the Board was not recorded "due to technical difficulties."  *See* Compl., ¶¶ 155-159.  This allegation, too, fails for multiple reasons.  One, as the Appeals Board explained, the fact that a "technological malfunction occurred during the hearing so that the Complainant's testimony could not be heard" on the recording "is not . . . a procedural error that would have had a detrimental impact on the outcome of the hearing."  Appeals Bd. Op.,

---

[3] Doe's repeated reference to the fact that the Complainant asked her roommates to leave the bedroom before she entered it with Doe, *see* Compl., ¶¶ 67, 102, 137, also does not plausibly allege an evidentiary deficiency in the Board's outcome.  The Board expressly found the vaginal sex *began* as consensual, but then became non-consensual when Complainant expressly said "stop" twice and Doe refused to stop.  That progression of events is entirely consistent with Complainant asking her roommates to leave the bedroom before she entered it with Doe.

[4] For the same reason, Doe's allegations regarding allegedly conflicting accounts of events that took place after the sexual assault, *see* Compl., ¶¶ 76-77, 102, also fail to plausibly suggest an erroneous outcome given that Doe knew of all of these alleged inconsistencies prior to the hearing and had the opportunity to argue their relevance to the Conduct Board.

Ex. C, at 7.  Doe attempts to capitalize on the failure of the recording equipment to speculate that Complainant may have said something at the hearing that he could use to prove she was not credible.  But the Conduct Board both heard Complainant's testimony, and also had her multiple prior statements, and it expressly found that "her statements were consistent throughout the process."  Conduct Bd. Op., Ex. B., at 7.  The mere lack of a recording is certainly not a "particularized allegation" that Complainant in fact made *inconsistent* statements during her testimony.  Doe's allegation that the recording would have revealed such inconsistencies is precisely the sort of speculative allegation that does not give rise to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Two, because of the malfunction of the equipment, the University offered Doe the opportunity to have a new hearing before the Conduct Board.  *See* Decl. of Gabriel Nugent, Ex. D.  Doe cannot claim an erroneous outcome from a procedural issue the University offered to correct.  The Court may consider these facts, which are akin to an offer of settlement and release, on a motion to dismiss.  A court may "grant a motion to dismiss on the basis of a binding release agreement where . . . the terms of the agreement are clear and unambiguous."  *2 Broadway L.L.C. v. Credit Suisse First Boston Mortg. Capital L.L.C.*, No. 00 CIV. 5773 GEL, 2001 WL 410074, at *6 (S.D.N.Y. Apr. 23, 2001); *see also Gupta v. Headstrong, Inc.*, No. 17-CV-5286 (RA), 2018 WL 1634870, at *2-3 (S.D.N.Y. Mar. 30, 2018) (court may consider a document such as a settlement agreement that is "integral" to the claims in the complaint and could serve to "bar[] any and all claims" (internal quotation marks omitted)).  This principle applies here because the University's explicit offer to conduct a new Conduct Board hearing, at which Complainant's testimony could be recorded, properly serves to bar Doe's claim that he is entitled to relief based on the malfunction of the recording equipment.

15

**B.** **Doe Also Has Not Set Forth Adequate, Plausible Allegations That Any Erroneous Outcome In This Case Resulted From Gender Bias.**

Simply alleging that a disciplinary proceeding resulted in a potentially flawed outcome is not sufficient to plead a claim under Title IX. Rather, a plaintiff must also "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Prasad*, 2016 WL 3212079, at *14 (quotation marks omitted); *see also Columbia*, 831 F.3d at 57 (holding that while allegations that a hearing process favored victims over the accused might "support the inference of bias, they do not necessarily relate to bias on account of sex"). Allegations potentially sufficient to state a claim of gender bias include discriminatory "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.

Again, precedent provides useful comparators. In *Yusuf*, the court found that plaintiff had adequately alleged that "various actions by the presiding official of the disciplinary tribunal prevented [plaintiff] from fully defending himself," 35 F.3d at 716, and that "males accused of sexual harassment at Vassar are 'historically and systematically' and 'invariably found guilty, regardless of the evidence, or lack thereof.'" *Id.* In *Columbia*, the court noted an environment during the adjudication of plaintiff's case in which there was "substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students." 831 F.3d at 57. Not only had these criticisms come to the attention of the University president – who had "called a University-wide open meeting with the Dean to discuss the issue," *id.* – but of particular note, the *very investigator* in charge of plaintiff's case had been "specifically accused of conducting the investigations in a manner that favored male athletes and that was insufficiently protective of sexually assaulted females." *Id.* at 58. Likewise, in *Prasad*, the plaintiff plausibly alleged gender

16

bias as motivating the adverse result of his proceeding.  The court pointed to, *inter alia*, "the differential treatment Plaintiff and Doe received during the adjudicatory process, an Investigative Report that misconstrued and slanted the evidence against Plaintiff, a drastic turnaround in one investigator's position during the final weeks of the investigation," and that proceedings at Cornell in which male students are accused of sexual assaults "'invariably' end adversely to male respondents."  2016 WL 3212079, at *16 (quotation marks omitted); *see also Rolph v. Hobart and William Smith Colleges*, 271 F. Supp. 3d 386 (W.D.N.Y. 2017) (finding sufficient allegations of gender bias where a university was subject to a *New York Times* investigation regarding its sexual assault proceedings in the months leading up to plaintiff's expulsion, and the procedure and conduct of plaintiff's proceedings evinced a systemic bias toward women).

Here, even if Doe were able to make a plausible claim of an erroneous outcome, his Title IX claim still fails because he has not adequately alleged that "gender bias was a motivating factor behind the erroneous outcome."  *Yusuf*, 35 F.3d at 715.  Doe's primary allegation is that the Board could only have assessed his case through a "grossly gender-biased lens," given the supposed "glaring problems with [Complainant's] credibility" and the "Board's findings that Roe consented to oral sex and that there was no evidence anal sex had occurred."  Compl., ¶ 138.  As discussed above, however, Doe's allegations are inconsistent with the very Board decision upon which he relies.  But even beyond that, Doe's allegation proves too much:  the fact that the Board did *not* find Doe responsible on two of the three allegations made by Complainant shows that the Board did *not* approach this case from a predetermined, gender-biased perspective.  Because it found insufficient evidence that the initial sexual activity was non-consensual, the Board imposed the lesser sanction of suspension, rather than expulsion.  This is precisely the opposite of what a gender-biased decision maker would have done.

Doe's other allegations of bias fare no better.  Doe alleges the investigation "was tainted by investigator bias from its inception" because "Defendant Jacobson has a background in assisting, advising, and protecting the rights of victims of sexual assault."  Compl., ¶ 91.  That allegation of bias is refuted by the face of Jacobson's Report, which expressly found that Doe "provided information openly and sincerely," that his "version of events is plausible and largely corroborated by other witnesses, the exception being the issue of consent central to this investigation," and that his statements were "generally reliable: his responses are not deceptive but on occasion lack specificity which limits their utility."  Report, Ex. A, at 10-11.  Doe's allegation of investigator bias also is inconsistent with his comment to Jacobson regarding the summary of Doe's interview, "Appreciate the fair write up. . . ."  *Id*., Attach. at 9.  The allegation also is far afield from other cases, where specific investigators had been singled out for criticism in the past and thus had plausible reasons to reach predetermined outcomes in future cases.  *See*, *e.g.*, *Columbia*, 831 F.3d at 58 (investigator "had suffered personal criticism in the student body for her role in prior cases in which the University was seen as not taking seriously the complaints of female students").  If Doe's allegation here is sufficient, then any investigator who had previously had any role in addressing claims of sexual assault could be tagged as inevitably biased.

Doe's allegation that the Conduct Board reviewed his case through the allegedly-biased framework of a "trauma-informed approach" is more speculative still.  Compl., ¶¶ 127-135.  Doe bases this theory on a February 6, 2017 press release noting that University faculty and staff took part in a Title IX training that "educates investigators and adjudicators so the University is able to provide impartial, equitable and trauma-informed investigation and adjudication processes for students, faculty and staff."  *See* https://news.syr.edu/2017/02/university-faculty-staff-receive-training-on-investigating-complaints-of-sexual-violence-title-ix-compliance/  (cited  at  Compl.,

¶ 127).  That press release goes on to state, however, that the session included materials on "how to conduct adequate, reliable, thorough and impartial complaint investigations and adjudications, including the effects of trauma and the rights of both parties."  *Id.*  And, as part of the training, the University also hosted another session entitled "Fairness and Compassion for All Parties in the Complaint Process," which "reviewed how not to traumatize individuals who are going through the process, how to ask appropriate questions and how to phrase questions in different ways to get the necessary information to make an assessment about the facts."  *Id.*  Nothing in this press release – the sole basis for Doe's lengthy allegations regarding the University's purported adoption of a "trauma-informed approach" – remotely suggests the Board received training in "questionable principles," that would have led them to view inconsistencies as "a natural byproduct of sexual assault as opposed to an indicator that the complainant's story may lack credibility."  Compl., ¶ 135.  Likewise, the mere fact the Department of Education's Office of Civil Rights opened inquiries into the University's handling of factually distinct sexual assault allegations, more than six months before the Board's decision in this case, hardly demonstrates that bias infected the Board's decision.  *Id.*, ¶¶ 173-174.  Indeed, dozens of institutions have been the subject of ongoing OCR investigations, and if that is sufficient to allege an inherent bias, then universities nationwide will have to cease processing claims of sexual assault.  *See* The Chronicle of Higher Education, Title IX Tracking Sexual Assault Investigations, https://projects.chronicle.com/titleix/ (noting that since April 2011 the government has conducted 458 investigations of colleges for possibly mishandling reports of sexual violence).[5]

---

[5] In addition, the statistics Doe alleges – "that the number of forcible sex offenses/rapes reported on Syracuse's campus has steadily increased" – do not support his allegations of bias.  Compl., ¶ 172.  Even if the University has "expanded the options for reporting sexual assaults," *id.*, that says nothing about how the University adjudicates any of those claims.  And, even if it were case that more allegations are made against men rather than women (something Doe does not even

**III.    Doe's New York State Constitutional Claim, Count Two, Fails As A Matter of Law.**

In order to state a claim for a violation of due process under the New York constitution, a plaintiff must allege "[s]tate involvement in the objected to activity." *Sharrock v. Dell Buick-Cadillac, Inc.*, 45 N.Y.2d 152, 160 (1978); *see also Stuart v. Palmer*, 74 N.Y. 183, 187 (1878). Doe's sole allegation in this regard is that because Defendants are obligated to follow state law, namely the Education Law Article 129-B ("Enough is Enough"), "New York State has significantly involved itself and become a meaningful participant in otherwise private conduct." Compl., ¶ 205.  Not so.  The Court of Appeals has repeatedly held a "finding of state action may not be premised solely on [a] private entity's creation, funding, licensing, *or regulation* by the government." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003) (emphasis added); *see also Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009).  Yet that is the sole basis for Doe's claim.

Not surprisingly, therefore, New York courts have specifically *rejected* claims that private universities' adherence to state education laws, including "Enough is Enough," makes those institutions subject to New York's due process clause.  In *Jacobson v. Blaise*, 69 N.Y.S.3d 419, 421 (N.Y. App. Div. 3d Dep't 2018), the court noted that § 6444(5)(b) of the Education Law, dealing with disciplinary proceeds, "'*should not be read to extend to private colleges the constitutional due process rights that apply to public colleges*.'"  *Id.* (emphasis added) (quoting New York State Education Department, Complying with Education Law article 129–B at 26 [2016], http://www.highered.nysed.gov/ocue/documents/Article129–BGuidance.pdf)).  Likewise, in *Doe v. Cornell University*, 70 N.Y.S.3d 750 (N.Y. Sup. Ct., Tompkins Cty. 2017), the court

---

allege), "[i]t is a simple fact that the majority of accusers of sexual assault are female and the majority of the accused are male, therefore enforcement is likely to have a disparate impact on the sexes." *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1225 (D. Or. 2016).

refused to apply due process requirements to Cornell's student disciplinary procedures, holding "[a]s a private university, the charged student is not entitled to the 'full panoply of due process rights . . . and [the university] need only ensure that its published rules are substantially observed.'" *Id*. at 758 (quoting *Matter of Kickertz v. New York Univ.*, 25 N.Y.3d 942, 944, (2015); *see also Doe v. Skidmore Coll.*, 59 N.Y.S.3d 509, 513 (N.Y. App. Div. 3d Dep't 2017) ("Petitioner's claims as to fundamental fairness are without merit as respondent is not a public university.  Thus, its relationship with its students is essentially a private one such that, absent some showing of State involvement, its disciplinary proceedings do not implicate the full panoply of due process guarantees." (internal quotation marks omitted)).  For this reason, Doe's state-law due process claim should be dismissed.

## IV.    Doe's Breach Of Contract Claims, Counts Three And Four, Also Are Inadequate.

In New York, "the relationship between a university and its students is contractual in nature." *Yu*, 97 F. Supp. 3d at 481 (quotation marks omitted).  Nonetheless, "[n]ot every dispute between a student and a university is amenable to a breach of contract claim." *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998).  In order to adequately plead such a claim, a plaintiff must allege the breach of a contract that "provides for certain specified services as courts have quite properly exercised the utmost restraint applying traditional legal rules to disputes within the academic community." *Baldridge v. State*, 740 N.Y.S.2d 723, 725 (N.Y. App. Div. 3d Dep't 2002).  Thus, a student "must identify 'specifically designated and discrete promises.'  'General policy statements' and 'broad and unspecified procedures and guidelines' will not suffice." *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (quoting *Ward v. N.Y. Univ.*, No. 99 Civ 8733 (RCC) 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000)); *see also Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 359-60 (N.D.N.Y. 2014) (finding that an alleged violation

of the requirement that "standards of consistency and equity [in disciplinary proceedings are maintained]" could not form the basis of a breach of contract claim) (quotation marks and alterations omitted).    Under these well-established standards, Doe's breach of contract claims – almost all of which are substantively identical to his Title IX allegations – fail.

As an initial matter, Doe's allegation that Defendants breached the implied covenant of good faith and fair dealing, Compl., ¶ 216, should be dismissed because "'a breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed.'"  *Yu*, 97 F. Supp. 3d at 482 (quoting *MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Sup. Ct., N.Y. Cty. 2010)).  Doe makes no separate allegations as regards good faith and fair dealing, and thus these claims fail.

Doe's claim that Defendants breached a contractual obligation by discriminating against him on the basis of his gender, Compl., ¶ 218(a), or were not fair and impartial, *id.*, ¶ 224, fails because "a general statement of a university's adherence to existing anti-discrimination laws does not create a separate and independent contractual obligation." *Nungesser*, 169 F. Supp. 3d at 370. But even were this not the case, these allegations fail because Doe has not adequately pleaded Defendants discriminated against him, let alone on the basis of his gender.  *See supra* 16-19.

Doe's next allegation – that the technical mishap resulting in Complainant's testimony not being recorded constitutes a breach of contract, Compl., ¶¶ 218(b), 224 – fails for the same reason it did when framed as a Title IX violation:  The University offered Doe a new hearing and Doe has made nothing more than highly speculative claims as to why the absence of a recording called into question the correctness of his disciplinary proceeding.  *See supra* 15.  Doe claims that the University breached a contract by "failing to provide Doe with 'the relevant facts and circumstances learned during the course of the investigation,' as provided for in the *Student*

*Conduct Procedures*, 10.8."  Compl., ¶ 218(c).  But Section 10.8 nowhere provides that a student will be furnished with this information.  Section 10.7, which contains the phrase Doe quotes, provides that the *Investigative Report* "will describe the relevant facts and circumstances learned during the course of the investigation."  Beyond attacking Complainant's credibility, Doe nowhere pleads that the Report failed to comply with this requirement.

Doe alleges that the University "fail[ed] to adhere to the 'preponderance of evidence' standard," Compl., ¶ 218(d), and likewise "[a]rbitrarily and capriciously f[ound] that Roe withdrew her consent to intercourse," *id.*, ¶ 224.  But as explained above, the Conduct Board decision makes clear that the Board *did* apply the preponderance of the evidence standard, *see* Conduct Bd. Op., Ex. B at 3, which is precisely the basis on which the Board found insufficient proof that Complainant had indicated a lack of consent, through words or actions, to oral sex.  At bottom, Doe simply disagrees with the substantive result the Board reached.  That is hardly an allegation that Defendants breached a "discrete promise[]," as necessary to survive a motion to dismiss.  *Nungesser*, 169 F. Supp. 3d at 370 (quotation marks omitted).

Doe's other allegations regarding the procedures applied during his disciplinary proceeding are similarly insufficient.  Doe alleges Defendants "fail[ed] to provide specific notice to Doe of the allegations against him," Compl., ¶ 224, yet he concedes that at the outset of the process Defendant Jacobson informed him of Roe's allegations, *see id.*, ¶ 85.  Moreover, Doe admits that before the Conduct Hearing, he had the full Investigative Report.  *Id.*, ¶ 89, 103-105.  Doe also complains that the Board considered a "nurse's letter that merely documented Roe's allegations," which he had not received.  *Id.*, ¶¶ 98-99, 224.  Yet the Board only used this letter to *reject* the anal sex allegation against Doe, and it caused him no prejudice.  As discussed above, the fact that Complainant had vaginal bleeding, but not anal bleeding – causing the Board to conclude it lacked

sufficient evidence to find that anal sex had occurred – did not establish that Complainant had fabricated her consistent claim that, during *vaginal* sex, she twice said "stop" and withdrew her consent to that sexual activity.

Doe's claim that Defendants "fail[ed] to provide Doe the opportunity to confront and cross-examine witnesses," *id*., ¶ 224, fails for two independent reasons.  One, Doe does not allege the existence of a single specific University policy or procedure that provides for cross-examination in these hearings, and his allegation that the University has "an express or implied contract . . . to ensure that the proceedings against John Doe were conducted in good faith and with basic fairness," *id.*, ¶ 223, is a classic example of "the mere allegation of mistreatment without the identification of a specific breached promise or obligation [that] does not state a claim on which relief can be granted."  *Gally*, 22 F. Supp. 2d at 207.  Two, Doe's attempt to impose a cross-examination requirement the University itself has not chosen to adopt is particularly misplaced given that New York courts have held that "Enough is Enough" "*does not require a college to permit cross-examination of a complainant or a witness*.  The right to cross-examine witnesses is limited in administrative proceedings." *Skidmore Coll.*, 59 N.Y.S.3d at 513.  As the court went on to note, New York law "does not require colleges to offer hearings as part of their disciplinary procedures for such violations.  Instead, as indicated by the qualified statutory language and further clarified by guidelines issued by the Education Department, the Enough is Enough Law requires colleges to provide students with an opportunity to offer evidence, but permits them to do so by a method other than a hearing, such as an investigatory process (*see* New York State Education Department, Complying with Education Law Article 129–B at 27 [2016])." *Id.*

Finally, Doe's complaint regarding his sanction is again simply a substantive disagreement with the outcome the Board reached.  *See* Compl., ¶ 224.  The Board chose not to expel Doe, and

instead provided a detailed rationale for why a suspension was appropriate. *See* Conduct Bd. Op., Ex. B, at 9-10. Although he alleges the Board's decision was "arbitrary and capricious," Doe does not point to any deficiencies in the Board's procedures or reasoning, let alone that the Board or Defendants violated a contractual agreement with Doe.

## V. Doe's Promissory Estoppel Claim, Count Five, Which Is Derivative Of His Other Allegations, Also Fails.

Under New York law, "[t]o establish a viable cause of action sounding in promissory estoppel, a plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise." *Gurreri v. Assocs. Ins. Co.*, 669 N.Y.S.2d 629, 631 (N.Y. App. Div. 2d Dep't 1998). Doe's allegation of a breach of promissory estoppel is entirely derivative of his Title IX and breach of contract claims: "Defendant Syracuse expected or should have expected John Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including . . . to have any claims brought against him under the Campus Code of Conduct be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly." Compl., ¶ 229. As discussed above, Doe has failed to plausibly allege that Defendants denied him any of these protections when adjudicating his disciplinary proceeding. *See supra* 9-15. For this reason, his allegation of promissory estopped should likewise be dismissed. *Cf. Yu*, 97 F. Supp. 3d at 483 (rejecting an estoppel claim "[i]n light of the fact that the Court has already found that Vassar complied with its procedures and that there is insufficient evidence of gender discrimination against Yu").

## <u>CONCLUSION</u>

For the foregoing reasons, Doe's Complaint should be dismissed with prejudice.

Respectfully submitted,

s/ *David W. DeBruin*

Jeremy M. Creelan                          David W. DeBruin
JENNER & BLOCK LLP                         Ishan K. Bhabha
919 Third Avenue                           JENNER & BLOCK LLP
New York, NY 10022-3908                     1099 New York Avenue, N.W., Suite 900
(212) 891-1678                              Washington, DC 20001-4412
jcreelan@jenner.com                         (202) 639-6015
*Attorney for Defendants*                   ddebruin@jenner.com
                                            *Attorneys for Defendants*

Dated: May 14, 2018

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 14, 2018, I electronically filed the foregoing with the Clerk of

Court, to be served on all parties of record via the CM/ECF system.

By:    <u>s/ *David W. DeBruin*     </u>
        David W. DeBruin