UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN DOE,

        Plaintiff,

  -v-             5:18-CV-377

SYRACUSE UNIVERSITY; SYRACUSE
UNIVERSITY BOARD OF TRUSTEES; KENT
SYVERUD, in his individual capacity; PAMELA
PETER, in her individual capacity; SHEILA
JOHNSON-WILLIS, in her individual capacity;
and BERNERD JACOBSON, in his individual
capacity,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:       OF COUNSEL:

NESENOFF & MILTENBERG, LLP  ANDREW MILTENBERG, ESQ.
Attorneys for Plaintiff     PHILIP A. BYLER, ESQ.
363 Seventh Avenue - 5th Floor  STUART BERNSTEIN, ESQ.
New York, NY 10001

JENNER & BLOCK      DAVID DEBRUIN, ESQ.
Attorneys for Defendants    ISHAN KHARSHEDJI BHABHA, ESQ.
1099 New York Avenue, Suite 900
Washington, DC 20001

919 Third Avenue      JEREMY M. CREELAN, ESQ.
New York, NY 10022

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

Plaintiff John Doe brought suit against Syracuse University ("SU"); the SU Board of Trustees; SU Chancellor and President Kent Syverud; SU Assistant Dean/Director of the Office of Student Rights and Responsibilities Pamela Peter; SU Interim Chief, Equal Opportunity and Title IX Officer Sheila Johnson-Willis; and SU Equal Opportunity and Title IX Investigator Bernerd Johnson, each in their individual capacities (collectively "defendants"), alleging violations of federal and state common law.  He seeks declaratory relief and money damages.

Defendants have moved pursuant to Federal Civil Procedure Rule 12(b)(6) seeking to dismiss the complaint in its entirety for failure to state any claims upon which relief could be granted.  Plaintiff opposed and defendants replied in further support of their motion.  Oral argument was held on August 8, 2018, in Utica, New York.

## II. BACKGROUND

The following facts are drawn from the five count complaint and assumed true for purposes of this motion.  This suit arises out of defendants' actions and procedures in investigating and adjudicating a complaint of sexual assault filed by SU student (pseudonym) Jane Roe ("Jane") against fellow SU student, plaintiff (pseudonym) John Doe ("plaintiff" or "John").

Jane's allegation of non-consensual sexual conduct arose out of an encounter between the two students on September 1, 2016.  Following the incident, on October 27, 2016, Jane filed a complaint of sexual assault with SU.  SU investigated the incident,

interviewed complainant Jane, the accused John, and nine other SU students, and compiled an investigative report.

**A.  The Incident**

On September 1, 2016, John and his roommate met friends at a local bar.  Compl. ¶ 55–56.  John met Jane at the bar and eventually the group went to a nearby fraternity house where John and Jane continued talking.  Id. ¶¶ 57–59.  Jane invited John back to her dormitory suite after the party.  Id. ¶ 60.  The two, along with Jane's friends, brought food back to the suite where they hung out in the common room.  Id. ¶ 61.  After the roommates left the common area, Jane and John began to kiss.  Id. ¶¶ 62–64.

While still in the common area, John asked Jane if she wanted to engage in oral sex. Id. ¶ 65.  Jane verbally consented and began to perform oral sex on John.  Id. ¶ 66.  Jane then suggested they go to her bedroom to continue, and John agreed.  Id.  Jane asked her roommates to leave the bedroom.  Id. ¶ 67.  They then had sex in Jane's bedroom for approximately ten minutes.  Id.  Jane never revoked her consent and never told John to stop. Id.  The only sexual activity they engaged in while in Jane's bedroom was vaginal intercourse.  Id. ¶ 73.

After they finished having sex, John got dressed and Jane asked if they could exchange contact information.  Id. ¶ 71.  The two kissed and John left Jane's room.  Id. ¶ 72.

The next day, September 2, 2016, Jane and John exchanged text messages and Jane invited John over to her room again, but John had a prior commitment.  Id. ¶ 74.  A few days later, John expressed to Jane his concern about pregnancy due to their having unprotected sex.  Id. ¶ 75.  On the following day, John saw Jane with friends.  Id. ¶ 76.  The

group then went together to the fraternity house where they had previously spent time.  Id. They had drinks and also went to a local restaurant together.  Id.

Four days later, John heard a rumor that he had done "unspeakable things" to Jane, which shocked and confused him.  Id. ¶ 77.  As rumors circulated, John purposefully avoided Jane.  Id. ¶ 78.

## B. Jane's Complaint and SU's Investigation

Approximately two months after the incident, on October 27, 2016, Jane brought a formal complaint against John for alleged sexual misconduct.  Id.  In her complaint, Jane contended that on the day of the incident:  (1) John had forced her into non-consensual oral sex, (2) that she had withdrawn her consent prior to having vaginal sex, and (3) that he had engaged in non-consensual anal sex with her.  Id. ¶ 79.  Jane also alleged that on September 5, 2016, John had "inappropriately touched her" during their group meal at a local restaurant and elsewhere.  Id. ¶ 102.  Upon receipt of Jane's formal complaint and pursuant to internal policy, SU's Title IX Coordinator tasked defendant Bernerd Jacobson ("Investigator Jacobson") with investigating Jane's complaint.  Id. ¶¶ 80–81.

On November 14, 2016, John was notified by e-mail that a formal complaint had been lodged against him for potentially violating the SU Code of Student Conduct, but the notice did not provide any details as to the alleged misconduct.  Id. ¶¶ 82–83.  John later learned during a meeting with Investigator Jacobson that Jane's story had changed; initially she reported that the vaginal sex was consensual but that the oral sex and alleged anal sex were non-consensual, but in a later interview she claimed she had withdrawn consent during the vaginal sex.  Id. ¶ 85.

Pursuant to internal SU policy, the Title IX investigator must, at the conclusion of the investigation, issue a report to the SU Conduct Board (the "Conduct Board") which "describe[s] the relevant facts and circumstances learned during the course of the investigation and . . . contain[s] all of the interviews conducted by the investigator." Id. ¶ 90. The Conduct Board then relies upon that report, in conjunction with their hearing, to adjudicate the complaint.

According to John, Investigator Jacobson failed to act neutrally and impartially due to his extensive "background in assisting, advising, and protecting the rights of victims of sexual assault." Id. ¶ 91.  As a result, he impermissibly presumed John's guilt rather than his innocence, and failed to critically examine the inconsistent statements Jane provided. Id. ¶¶ 91–92.

John alleges Investigator Jacobson was impartial because:  he characterized Jane's testimony as "consistent" despite the inconsistencies in her account; he only interviewed John once and did not investigate the issues that John raised about Jane's credibility, and he failed to do so despite John informing him that Jane had given different accounts of what had happened to different people.  Id. ¶ 95.

John also contends that Investigator Jacobson failed to investigate contradictory statements regarding Jane's behavior following the alleged assault, as relayed by other students.  Id. ¶ 96.  For example, one student claimed Jane "didn't go out for a long time" after the alleged assault, while other students noted her attendance at several campus events subsequent to September 1, 2016.  Id.

Further, according to John, Investigator Jacobson did not provide him all of the evidence Jane submitted and did not allow him to respond to that evidence before it was

provided to the Conduct Board.  Id. ¶ 97.  For example, Jane provided Investigator Jacobson

a letter from a nurse that relayed Jane's report of the incident and Jane's own statement that

she had suffered vaginal bleeding.  Id. ¶ 98.  However, in the investigation, Jane had not

alleged that she had any vaginal bleeding, rather she claimed she had anal bleeding.

Because John was not provided a copy of the nurse's letter, he missed another opportunity

to show the inconsistencies in Jane's story.  Id. ¶ 99.  Moreover, Investigator Jacobson never

informed John of the identities of the other witnesses he interviewed, thereby denying John

the opportunity to challenge their testimony.  Id. ¶ 100.

Finally, plaintiff asserts that Investigator Jacobson's report characterizing Jane's

account as "wholly plausible, no contradictions or omissions are noted" is *incredible* in light of

student witnesses' testimony that:  the interactions between John and Jane in the common

room were mutual; two students left the common room with the sole purpose of providing

privacy to John and Jane to engage in sexual conduct; to Jane's roommate, it was "pretty

clear what they were doing to do and [Jane] seemed ok with it" as to Jane asking her

roommates to leave before the two went into her bedroom; Jane's roommates made no

mention of her crying in her bedroom despite her claim that they heard her crying; Jane's

roommate commented "I did hear stuff like sex noises, but nothing unusual"; and despite

Jane's claim that John had inappropriately touched her at the restaurant, none of the

students present corroborated Jane's claim.  Id. ¶ 102.

### C. Conduct Board Hearing and Decision

Investigator Jacobson completed his investigation and issued his report to the

Conduct Board.  On February 10, 2017, the Conduct Board held a hearing at which Jane and

John appeared separately to present additional information.  Id. ¶110.  Neither Investigator

Jacobson, nor any of the student witnesses whose testimonies were included in his report, were asked to testify.  Id. ¶ 114.  John was not permitted to question Jane, nor any of the other witnesses since they were not present.  Id. ¶ 116.  The Conduct Board accepted the aforementioned nurse's note and considered it a medical document "which noted vaginal bleeding," despite that the note merely recounted Jane's own statement that she had vaginal bleeding.  Id. ¶¶ 98, 112–113.  Despite SU policy that all Conduct Board interviews are to be recorded, John later learned Jane's interview was not recorded.  Id. ¶¶ 106, 154.  SU later claimed this was the result of "technical difficulties."  Id. ¶ 155.

Ten days later, on February 20, 2017, the Conduct Board issued its decision.  Id. ¶ 117.  It determined that on September 1, 2016, John had engaged in non-consensual vaginal sex with Jane after she had withdrawn her initial consent.  Id. ¶ 118.  The Conduct Board rejected Jane's claim that the oral sex was non-consensual and stated it was "unable to determine if anal sex" had occurred.  Id. ¶¶ 120–121.  Thus, it found credible Jane's claim of withdrawn consent during vaginal sex, yet found incredible her claim regarding oral sex. The Conduct Board found, by a preponderance of the evidence, that John violated three provisions of SU's Code of Student Conduct.[1]  Id. ¶¶ 109, 117.

---

[1]  John was found to have violated the following sections:

Section 1:  Physical harm or threat of physical harm to any person or persons, including, but not limited to:  assault, sexual abuse, or other forms of physical abuse.

Section 3:  Conduct -- whether physical, verbal or electronic, oral, written or video -- which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior.

Section 15:  Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements . . . .

### D. __Disciplinary Measures__

As a consequence of the Conduct Board's decision, John was banned from all of SU's campuses, and indefinitely suspended for "one academic year or until [Jane] graduates from Syracuse, whichever is longer."  Id. ¶ 140.  Plaintiff may only petition to return to SU after Jane graduates, if he provides:

> (i) a personal statement reflecting on what he has learned from the incident that resulted in his departure from SU and describing his activities since having been separated from SU;
>
> (ii) evidence of academic progress and/or gainful employment during his time away from SU;
>
> (iii) evidence of completion of at least 80 hours of community service;
>
> (iv) three character references; and
>
> (v) completion of an interview with the Sexual and Relationship Violence Response Team at the Syracuse Counseling Center.

Id. ¶ 141.

Further discipline included a notation on John's academic transcript that he was "suspended after a finding of responsibility for a code of conduct violation."  Id. ¶ 142.

John points out that SU took 116 days to render a decision from the filing of Jane's complaint to John's notice of the Conduct Board's decision, despite SU policy that "the process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances.  If circumstances arise that delays either the investigation or the Board's determination of an outcome, both parties will be sent written

notification of the delay and its cause."[2]  Id. ¶¶ 144, 146.  SU never provided John with any "written notification of the delay" or "its cause."  Id. ¶ 146.

As SU did not complete the investigation within 60 days (which would have been within the fall semester), John re-enrolled at SU for the spring 2017 semester with SU's permission.  Id. ¶ 147.  Accordingly, he paid the necessary tuition and fees, room and board costs, traveled back to Syracuse from his home, and resumed his "demanding curriculum." Id.  John contends that had the investigation been completed within the required 60 days, he would not have had to forfeit a third of the spring semester's tuition.  Id. ¶ 148.  Further, the delay negatively impacted his academic performance and caused him anxiety.  Id. ¶ 149. Moreover, he has suffered "severe and significant emotional damages" for which he has sought professional help and prescription medications.  Id. ¶ 183.

### E. Appeal of the Conduct Board's Decision

In anticipation of his appeal, John requested a transcript of the Conduct Board hearing and an extension of time to submit his appeal until he received the transcript.  Id. ¶¶ 150, 152.  His request was denied and on March 10, 2017, he appealed the Conduct Board's decision to the SU Appeals Board (the "Appeals Board"), without the benefit of the transcript. Id. ¶¶ 152–153.  On March 29, 2017, John received the transcript which, "due to technical difficulties," did not include any of Jane's testimony or questions the Conduct Board posed to her.  Id. ¶¶ 154–155.

On April 12, 2017, John learned that the Appeals Board upheld the Conduct Board's February 20, 2017 decision.  Id. ¶ 160.  The Appeals Board rejected John's various

---

[2] Title IX guidance also stated, at the time, that the disciplinary process should be completed with 60 days, excluding appeal.  Id. ¶ 145.

procedural and substantive challenges to the investigation, hearing, and decision, including the lack of a recording from the hearing.

SU policy dictates that "[s]tudents have a right to fundamental fairness before formal disciplinary sanctions are imposed," that all interviews conducted by the Conduct Board are to be recorded, and that either party can obtain access to the recorded interview.  Id. ¶¶ 161–162.  Despite this, the Appeals Board found that the "technological malfunction" which occurred while Jane testified was "not considered a procedural error that would have had a detrimental impact of the outcome of the hearing."  Id. ¶ 166.

### F.  The Complaint

On March 27, 2018, plaintiff filed the instant complaint.  He asserts the following causes of action:

> (1) a federal claim alleging SU was biased against plaintiff because he is male, in violation of Title IX;
>
> (2) a state law claim alleging a denial of due process, as guaranteed by the New York Constitution;
>
> (3) a state law claim alleging breach of contract;
>
> (4) a state law claim alleging a denial of basic fairness resulting in a breach of the implied covenant of good faith and fair dealing; and
>
> (5) a state law claim alleging promissory estoppel.

## III.  LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007)).  "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims."  Id.

In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken."  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016).

Furthermore, in reviewing a motion to dismiss, a court (1) accepts "as true all of the allegations contained in [the] complaint," except for "legal conclusions," (2) makes "all reasonable inferences in favor of the non-moving party," and (3) draws "on its judicial experience and common sense."  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).

## IV.  DISCUSSION

Defendants move to dismiss the complaint in its entirety.  Plaintiff opposes and contends defendants' arguments lack merit and that he has sufficiently pleaded his claims to withstand a motion to dismiss.

### A.  Title IX (Count 1)

Plaintiff's first cause of action alleges gender based discrimination in violation of Title IX of the Education Amendments Act of 1072.  John alleges SU reached the wrong result in its investigation and did so by impermissibly discriminating against him due to his gender.

Title IX, codified at 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  Because Title IX prohibits, under covered circumstances, subjecting a person to discrimination on account of sex, it is understood to "bar[ ] the imposition of

university discipline where gender is a motivating factor in the decision to discipline." Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).

Cases attacking university disciplinary proceedings on the ground of gender bias "fall generally within two categories." Yusuf, 35 F.3d at 715. The first category are "erroneous outcome" cases, like the one here, where "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." Id. The second category are those cases claiming "selective enforcement," which is not alleged in this case. Id. In either category of cases, the plaintiff must plead and prove that "the complained-of conduct was discriminatory." Id.

Thus, in order to plead a claim of discrimination under Title IX, a plaintiff must establish that the defendant discriminated against him because of his sex; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. Prasad v. Cornell Univ., No. 5:15-CV-322, 2016 WL 3212079, at *14 (N.D.N.Y. Feb. 24, 2016) (McAvoy, S.J.). "[A] complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent . . . if it pleads specific facts that support a minimal plausible inference of such discrimination." Columbia Univ., 831 F.3d at 56.

Further, a plaintiff bringing an erroneous outcome claim must do more than dispute the outcome of a disciplinary proceeding to survive a motion to dismiss. Rather, a plaintiff "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Yusuf, 35 F.3d at 715. "If no such doubt exists

based on the record before the disciplinary tribunal, the claim must fail."  Id.  However, the

pleading burden is not heavy.  A plaintiff may cast doubt by alleging "particular evidentiary

weaknesses behind the finding of an offense such as a motive to lie on the part of a

complainant or witnesses, particularized strengths of the defense," or a "procedural flaw[ ]

affecting the proof."  Id.

 In sum, a Title IX plaintiff must allege more than the "wrong" outcome from a

disciplinary proceeding:  a plaintiff must also "allege particular circumstances suggesting that

gender bias was a motivating factor behind the erroneous finding."  Cornell Univ., 2016 WL

3212079, at *14 (internal quotations omitted).  In Columbia Univ., the Second Circuit applied

the burden shifting framework established under McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973) to the Title IX claim at issue, finding a plaintiff faces only a "minimal burden"

in pleading gender based discriminatory intent.  Columbia Univ., 831 F.3d at 55.

 Where a plaintiff "has pointed to flaws in the [Title IX] investigation, assumptions made

by investigators, and an unwillingness by investigators to consider evidence . . . presented of

. . . innocence" and "contends that [the university] did not question [the complainant's]

credibility," combined with "allegations of public pressure on the University to more

aggressively prosecute sexual abuse allegations," such factual allegations support a finding

of "a minimal[ly] plausible inference of discriminatory intent."  Noakes v. Syracuse Univ., No.

5:18-CV-43, 2019 WL 936875, at *12 (N.D.N.Y. Feb. 26, 2019) (McAvoy, S.J.).

 First, defendants argue plaintiff has not set forth plausible allegations that SU reached

an erroneous result in this case.  Specifically, defendants contend that plaintiff does not

allege that witness statements were misquoted or misconstrued or that critical witnesses

were ignored.  Nor does he identify any basis Jane had to fabricate her story nor point to any

physical or other evidence that calls her claims into question.  On the main issue of whether Jane told John to stop during vaginal intercourse, defendants point out that John merely insists that the Conduct Board should have believed him and not Jane.  Defendants argue plaintiff has also failed to set forth adequate, plausible allegations that any erroneous outcome in this case resulted *from* gender bias.

Plaintiff opposes and contends his complaint contains precisely the kind of detailed allegations that the Second Circuit has found sufficient in other erroneous outcome cases. Moreover, John argues he has also pleaded ample allegations of gender bias.

Plaintiff's factual allegations are sufficient to cast an articulable doubt on the outcome of his disciplinary proceeding.  First, he insists that the oral sex was consensual, the vaginal sex was consensual, and no anal sex took place.  He alleges that no roommates heard Jane crying as she asserts, and instead one stated that it was "pretty clear what they were going to do and [Roe] seemed okay with it."  Compl. ¶ 68.  Moreover, no one corroborated Jane's claim that John touched her inappropriately at a restaurant, days after the alleged assault, despite there being multiple students present.

John alleges that witnesses were ignored or their statements misinterpreted, and that Jane changed her story from consensual vaginal sex to withdrawn consent.  Moreover, he contends her story was influenced by Investigator Jacobson.  John asserts that Jane's story was full of inconsistencies and contradicted by other students.  Specifically, the Conduct Board, in rejecting Jane's allegations of non-consensual oral and anal sex, could not have reasonably found credible her position that she withdrew consent during vaginal sex.  In other words, because they did not substantiate two of her claims, they could not find credible

her third.  All of these allegations, read together, cast an articulable doubt on the outcome of the disciplinary proceeding and satisfy the erroneous outcome prong of a Title IX claim.

Plaintiff has also pleaded facts sufficient to make it plausible that gender was a motivating factor behind the erroneous outcome.  He alleges Investigator Jacobson exhibited gender bias due to his prior professional experience advocating for victims of sexual assault. Compl. ¶ 195.  As a result of his bias, Investigator Jacobson assisted Jane in developing her story and accepted, without question, major changes in that story, including the fact that she first said she consented to vaginal sex and then changed her story to say that while she initially consented, she withdrew her consent.  Id.

John also contends defendants were influenced by biased sexual assault trauma training they received, specifically "trauma-informed investigation and adjudication processes," which is required by federal and New York State law.  Id. ¶¶ 127–128.  The goal of which, according to the U.S. Department of Education's Office of Civil Rights ("Office of Civil Rights"), is to ensure "the protection of girls and women."  Id. ¶ 127.  Recipients of this type of training are taught that "inconsistencies in a complainant's story are a direct result of the trauma," that is, that they are "a natural byproduct of sexual assault as opposed to an indicator that the complainant's story may lack credibility."  Id. ¶ 133.  Plaintiff contends that this "bias in favor of the female accuser" is the only explanation for the Conduct Board's findings in light of Jane's inconsistent allegations.  Id. ¶ 124.  This bias, according to John, is further evidenced by the Conduct Board's finding that Jane's "actions throughout the process are consistent with a traumatic event such as she described in her statement."  Id. ¶ 125.

Plaintiff further asserts that SU faced pressures internally, and externally from the federal government which resulted in defendants' gender bias.  He notes that at the time of

the investigation and disciplinary process, SU was under increased pressure from the federal government to "aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds." Id. ¶ 171.  Indeed, on January 17, 2016, and again on June 22, 2016, the Office of Civil Rights opened an investigation into the alleged mishandling of sexual investigations by SU.  Id. ¶¶ 173–174.  Furthermore, on January 24 and 25, 2017, only two weeks before plaintiff's hearing, Office of Civil Rights representatives visited SU.  Id. ¶ 175.  They investigated SU's "processes for the handling of complaints of sexual violence and harassment."  Id.  Plaintiff contends that in light of these pressures and publicity, SU "did not want another situation in which it could be perceived as ignoring the complaints of women on campus that SU was not a safe place for them to be."  Id. ¶ 178.  John has also alleged the differential treatment of males and females by defendants.  Id. ¶¶ 195–200.

Finally, plaintiff contends defendants failed to have other witnesses testify at the hearing; failed to comply with SU procedures designed to protect accused students including failing to record Jane's testimony at the hearing; and Investigator Jacobson, the Conduct Board, and the Appeals Board reached conclusions that were erroneous and contrary to the weight of the evidence.  All told, John has pleaded specific facts to suggest a plausible inference of sex discrimination.

Accordingly, plaintiff has adequately pleaded his Title IX claim at this early stage and defendants' motion to dismiss this claim will be denied.

## B.  Due Process Clause of the New York State Constitution (Count 2)

Plaintiff's second cause of action alleges a due process violation pursuant to Article I, section 6 of the New York State Constitution.  John alleges SU violated his due process

rights by failing to adequately notify him of the charges against him and failing to provide him a fair hearing.

The Due Process Clause of the New York Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."  N.Y. CONST., Art. I, § 6.  It is undisputed that in order to state a claim for a violation of due process under the New York State Constitution, a plaintiff must allege "[s]tate involvement in the objected to activity." Sharrock v. Dell Buick-Cadillac, Inc., 45 N.Y.2d 152, 160 (1978).

Defendants argue plaintiff's due process claim fails as a matter of law because they are not state actors.  Plaintiff opposes and contends that by invoking New York Education Law, he has alleged state involvement.

Plaintiff's sole allegation of state involvement is based on defendants' obligation to follow state law, namely New York  Education Law Article 129–B.  He contends that by virtue of this law, "New York State has significantly involved itself and become a meaningful participant in otherwise private conduct."  Compl. ¶ 205.

Neither party has provided caselaw specifically addressing a New York State constitutional law claim brought against a private university.  However, the trio of New York State trial and appellate court cases cited by defendants is instructive, though not directly on point.  See Jacobson v. Blaise, 157 A.D.3d 1072 (N.Y. App. Div. 3d Dep't Jan. 11, 2018); Doe v. Skidmore Coll., 152 A.D.3d 932 (N.Y. App. Div. 3d Dep't July 3, 2017); Doe v. Cornell Univ., 59 Misc.3d 915 (N.Y. Sup. Ct., Tompkins Cty. Dec. 15, 2017) aff'd, 163 A.D.3d 1243 (N.Y. App. Div. 3d Dep't July 12, 2018).  Each of these cases involved a New York Civil Practice Law and Rule ("CPLR") Article 78 proceeding.

The Jacobson case involved students at the State University of New York at Plattsburgh.  Jacobson, 157 A.D.3d at 1073.  The matter was brought pursuant to Article 78, and had been transferred to the Appellate Division, Third Department from Supreme Court, Clinton County.  Id.  The Jacobson Court considered, inter alia, whether the accused was afforded due process.  Id. at 1075.  In providing a primer on the Enough is Enough Law, the Court explained:

> In 2015, New York enacted article 129–B of the Education Law, known as the Enough is Enough Law (see L 2015, ch 76).  The purpose of this law was to require all colleges and universities in the State of New York to implement uniform prevention and response policies and procedures relating to sexual assault, domestic violence, dating violence and stalking (Sponsor's Mem, Senate Bill S5965 [2015]).

Id. at 1074 (internal quotations omitted).  It noted that although the law outlines the disciplinary process schools are to follow, it "should not be read to extend to private colleges the constitutional due process rights that apply to public colleges."  Id.

In the Skidmore case, an expelled Skidmore College student brought an Article 78 proceeding to annul the school's findings that he had violated its sexual and gender based misconduct policy.  Skidmore Coll., 152 A.D.3d at 932.  On appeal, the Appellate Division, Third Department considered whether the school's procedures violated the requirements of fundamental fairness, whether they complied with New York Education Law, and whether the Enough is Enough Law requires colleges to offer hearings as part of their disciplinary procedures for such violations.  Id. at 933–34.  In concluding that the accused's claims as to fundamental fairness were without merit, the Skidmore Court explained that "respondent is not a public university.  Thus, its relationship with its students is essentially a private one such that, absent some showing of State involvement, its disciplinary proceedings do not

implicate the full panoply of due process guarantees." Id. at 935 (internal quotations omitted).

In the Cornell case, the accused sought a declaration in Supreme Court, Tompkins County that the disciplinary determinations against him were not supported by substantial evidence as required by New York State law.  Cornell Univ., 59 Misc. 3d at 921–22.  The accused argued that the substantial evidence standard applied because Cornell University's findings were made as a result of hearings held pursuant to direction by law, namely the Enough is Enough Law.  Id. at 922.  The school argued that the substantial evidence standard does not apply to disciplinary determinations of private universities in New York State and that the school's procedures voluntarily provide a hearing even though the Enough is Enough Law does not require one.  Id.  The Court explained, "the fact that Cornell voluntarily adopted a policy which did permit a hearing to be conducted did not transform this into a situation where the hearing was pursuant to direction of law."  Id. at 923–24 (internal quotations omitted).

The Cornell Court further noted:

> Cornell is a private not-for-profit corporation, with four state-sponsored SUNY colleges.  Although Cornell receives some financial assistance from the State, this alone does not constitute a sufficient degree of State involvement so as to allow an intrusion into defendant's disciplinary policies.  As a private university, the charged student is not entitled to the full panoply of due process rights and the university need only ensure that its published rules are substantially observed.  In contrast, public universities are subject to due process requirements, and the substantial evidence standard applies.  With respect to private universities, however, the Court's role is much more limited, and private universities are given broad discretion in matters such as discipline against students.

Id. at 924 (internal quotations and citations omitted).

A claim for a violation of due process under the New York State Constitution requires an allegation of state involvement.  Such an allegation must include more than an obligation to follow, or adherence to, state law.  Regulation by the government does not turn private activity into state activity.  New York courts have been clear that private universities within the State are not required to provide the full constitutional due process rights that apply to public colleges.  That is not to say that students at private universities have no protections; schools within New York State must abide by the Enough is Enough Law.  Many have chosen to provide students additional rights over and above the minimum required by law.  As a private university, SU need only ensure that *its* published rules are substantially observed.  While plaintiff's complaint includes allegations that SU did not comply with its own published rules, those allegations do not support <u>Count 2</u>.  Instead, <u>Count 2</u> alleges that SU's failure to notify plaintiff of the charges against him and failure to provide him a fair hearing constitute a violation of the due process clause of the New York State Constitution.

Without state involvement, plaintiff's state law due process claim fails.  Accordingly, defendants' motion to dismiss this claim will be granted and <u>Count 2</u> will be dismissed.

## C. **Contract Based Claims** (<u>Counts 3</u>, <u>4</u>, and <u>5</u>)

Defendants argue plaintiff's contract based claims also fail as a matter of law.  Plaintiff opposes and contends defendants breached both express and implied contracts; the SU Student Rights and Responsibilities and the SU Student Conduct Procedures created express contracts between John and SU, and further, New York law recognizes that an implied contract arises once a student is admitted to a university and requires the university to act in good faith and fair dealing with the student.

**1.  Breach of Contract** (Count 3)

Plaintiff's third cause of action alleges a breach of contract pursuant to New York

State law.  John alleges SU breached its express and/or implied agreements with him and

that these breaches caused him damage.

"'In New York, the relationship between a university and its students is contractual in

nature.'"  Xiaolu Peter Yu v. Vassar Coll., 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015) (quoting

Papaspiridakos v. Educ. Affiliates, Inc., No. 10-CV-5628, 2013 WL 4899136, at *3 (E.D.N.Y.

Sept. 11, 2013) aff'd, 580 F. App'x 17 (2d Cir. 2014) (summary order)).  "[A]n implied contract

is formed when a university accepts a student for enrollment:  if the student complies with the

terms prescribed by the university and completes the required courses, the university must

award him a degree.  The terms of the implied contract are contained in the university's

bulletins, circulars and regulations made available to the student."  Papelino v. Albany Coll.of

Pharm. of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011) (internal quotations and citations

omitted).

"To survive a motion to dismiss for a breach of contract claim under New York law, the

complaint must allege facts which show:  (1) the existence of an agreement, (2) adequate

performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and

(4) damages."  Habitzreuther v. Cornell Univ., No. 5:14-CV-1229, 2015 WL 5023719, at *5

(N.D.N.Y. Aug. 25, 2015) (Sharpe, C.J.) (internal quotations and citations omitted).  "A

student may sue his college or university for breach of an implied contract in certain

situations."  Routh v. Univ. of Rochester, 981 F. Supp. 2d 184, 207 (W.D.N.Y. 2013).

However, "[t]he application of contract principles to the student-university relationship does

not provide judicial recourse for every disgruntled student." Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 359 (N.D.N.Y. 2014) (Baxter, M.J.).

"'[T]o state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.'" Habitzreuther, 2015 WL 5023719, at *4 (quoting Radin v. Albert Einstein Coll. of Medicine of Yeshiva Univ., No. 04-CV-704, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005)). It is true that "[a] college is contractually bound to provide students with the procedural safeguards that it has promised." Yu, 97 F. Supp. 3d at 481 (internal quotations omitted). But to pursue a contract claim on that basis, a plaintiff must identify a specific promise or obligation that was breached. See Okoh v. Sullivan, No. 10-CV-2547, 2011 WL 672420, at *4 (S.D.N.Y. Feb. 24, 2011) ("[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted."). Therefore, "[c]onclusory allegations that a defendant breached an agreement are insufficient to support a breach of contract claim." Habitzreuther, 2015 WL 5023719, at *5; see also Ward v. N.Y. Univ., No. 99-CV-8733, 2000 WL 1448641, at *5 (S.D.N.Y. Sept. 28, 2000) ("[B]ald assertions and conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim.").

Although defendants concede that "the relationship between a student and a private university is one of contract," they contend John has failed to allege any breach of contract that is beyond "general policy statements" and "broad and unspecified procedures and guidelines." Defs.' Reply at 10. In opposition, plaintiff argues that defendants breached specific promises made in its Student Rights and Responsibilities document (the "SRP") and

in its Student Conduct Procedures (the "SCP"), which form the terms of the implied contract. Therefore, he contends he has alleged more than mere statements of policy.

In his complaint, plaintiff alleges four specific breaches:

(1) gender discrimination in violation of the non-gender discrimination rights guaranteed by the SRP,

(2) a violation of the right to fundamental fairness by failing to record and provide John with a recording of Jane's testimony in violation of the terms of the SCP,

(3) a failure to provide John with the relevant facts and circumstances of the investigation in violation of the terms of the SCP, and

(4) a failure to adhere to the preponderance of evidence standard established by the SCP.

Compl. ¶ 218.

John's allegations include promises made by defendants that cannot be characterized as generalized "policy statements" or "unspecified procedures." The alleged breaches specifically refer to expressly enumerated conditions and rights, such as the guarantee of the preponderance of evidence standard during a Conduct Board hearing, published by SU in regulations that it chose to make available to its students. These specific allegations are in contrast to general statements of policy such as "not [being] given sufficient notice of the complaint," the failure to conduct a "full and fair investigation," and a "lack of fundamental fairness," which New York law dictates cannot form the basis of a viable contract claim. Doe v. Syracuse Univ., 341 F. Supp. 3d 125, 140–41 (N.D.N.Y. 2018) (McAvoy, S.J.). Thus, John's allegations supporting his breach of contract claim are sufficient to make out a prima facie claim under New York law.

For these reasons, plaintiff has adequately pleaded a breach of contract claim and defendants' motion to dismiss Count 3 will be denied.

### 2. **Breach of the Implied Covenant of Good Faith and Fair Dealing** (Count 4)

While John has not specifically categorized his fourth claim as a breach of the implied covenant of good faith and fair dealing, from the facts pleaded and from later statements made in opposition, it can be reasonably inferred that the fourth claim is, at essence, a breach of the implied covenant of good faith and fair dealing.[3]

The implied covenant of good faith and fair dealing "encompasses the performance of any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Ferguson v. Lion Holding, Inc., 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007). Further, it includes the fundamental obligation that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (internal citations and quotations omitted).

However, "[a] breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed." Yu, 97 F. Supp. 3d at 482 (internal quotations omitted). "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" Id. (quoting Ely v. Perthuis, No. 12-CV-1078, 2013 WL 411348, at *5 (S.D.N.Y. Jan. 29, 2013)). "[R]aising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law

---

[3] The undersigned was unable to identify any specifically cognizable claim known as a "Breach of Contract/Common Law: Denial of Basic Fairness/Arbitrary and Capricious Decision Making." Compl. 39.

regularly dismiss any freestanding claim for breach of the covenant of fair dealing." Jordan v.

Verizon Corp., No. 08-CV-6414, 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008).

Defendants contend this claim should be dismissed because it is duplicative of the

breach of contract claim.  In opposition, plaintiff argues the claim is not duplicative because

SU's contractual relationship with its students includes an implied covenant of good faith and

fair dealing.

Plaintiff alleges his contract with SU contains "an implied covenant of good faith and

fair dealing" which "implicitly guaranteed that any proceedings would be conducted with basic

fairness."  Compl. ¶ 216.  He contends defendants breached this covenant by:  (i) failing to

provide him notice of the specific allegations against him; (ii) considering evidence at the

hearing that was not provided to him prior to the hearing; (iii) employing the "trauma-informed

approach" to bolster the accounts of female accusers and rationalize their inconsistencies;

(iv) failing to provide him the opportunity to be heard by a fair and impartial tribunal; (v) failing

to provide him the opportunity to confront and question witnesses at a hearing; (vi) arbitrarily

finding that Jane withdrew her consent to vaginal sex when her two other allegations of non-

consensual sex were rejected; (vii) failing to record Jane's testimony; and (viii) arbitrarily

suspending John for an indefinite period of time.  Id. ¶ 224.

In his complaint, John makes no meaningful difference between the allegations in

support of his breach of contract claim and the allegations in support of his breach of the

implied covenant of good faith and fair dealing claim.  A close examination of the facts

alleged in Count 3 and Count 4 reveals that both claims, at essence, arise from the same

operative facts and seek the same damages.  As a result, Count 4 asserting a breach of the

implied covenant of good faith and fair dealing is duplicative of Count 3 alleging a breach of contract.

Accordingly, defendants' motion to dismiss this claim as duplicative will be granted and Count 4 will be dismissed.

### 3. **Promissory Estoppel** (Count 5)

Plaintiff's fifth cause of action alleges a claim for promissory estoppel.

"In New York, promissory estoppel has three elements:   [1] a clear and unambiguous promise; [2] a reasonable and foreseeable reliance by the party to whom the promise is made; [3] and an injury sustained by the party asserting the estoppel by reason of the reliance."  Rolph v. Hobart & William Smith Colls., 271 F. Supp. 3d 386, 408 (W.D.N.Y. 2017).

Defendants argue John's promissory estoppel claim fails as a matter of law because it is derivative of his Title IX and breach of contract claims, in that plaintiff did not plausibly allege that defendants denied him of any of the implied or express promises made to him. Plaintiff disagrees and contends he has pleaded each element of a promissory estoppel cause of action with ample particularity.

John alleges "Defendant Syracuse expected or should have expected John Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including . . . to have any claims brought against him under the Campus Code of Conduct be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly."  Compl. ¶ 229.

Taking all factual allegations made by John as true which must be done on a motion to dismiss, he has sufficiently alleged a prima facie claim of promissory estoppel by pleading

plausible facts constituting each element.  He has alleged promises defendants made, that he relied on those promises, and that defendants denied him of the aforementioned protections when adjudicating his disciplinary proceeding, resulting in injury to him.

Thus, defendants' motion to dismiss Count 5 alleging a promissory estoppel claim will be denied.

## V.  CONCLUSION

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss is GRANTED in part and DENIED in part;

2.  Defendants' motion to dismiss as to Count 2 and Count 4 is GRANTED and those claims are DISMISSED;

3.  Defendants' motion to dismiss as to Count 1, Count 3, and Count 5 is DENIED and those claims remain for discovery and, if appropriate, summary judgment motions; and

4.  Defendants are directed to file an answer to Count 1, Count 3, and Count 5 within twenty (20) days of the date of this Decision and Order (by May 28, 2019).

United States District Judge

Dated:  May 8, 2019
        Utica, New York.